James P. DALY and James P. Daly, as Executor of the Estate of Ramon Gimeno Ibars, a/k/a Ramon Gimeno, Plaintiff,

v.

Orlando CASTRO LLANES, Orlando Castro Castro, Jorge Castro Barredo, Calixto E. Lanauze, Nereida H. Brito Vegas, Banco Progreso Internacional De Puerto Rico, Inc., and Banco Progreso, S.A.C.A., Defendants.

No. 98 Civ. 1196(AGS).

United States District Court, S.D. New York.

Dec. 10, 1998.

Randall David Bartlett, Bartlett, Bartlett & Ziegler, P.C., New York City, for plaintiff.

Barbara W. Bernstein, Jean E. Kalicki, Cleary, Gottlieb, Steen & Hamilton, Banco Progreso S.A.C.A., Washington, DC, Calixto E. Lanauze, defendant pro se.

## OPINION AND ORDER

SCHWARTZ, District Judge.

Plaintiff brings this action on behalf of himself and as the duly appointed executor of the Estate of Ramon Gimeno to recover funds allegedly fraudulently obtained by defendants in violation of the laws of the United States and of the State of New York. The case is before the Court on (1) defendant Calixto E. Lanauze's ("Lanauze") motion to dismiss the complaint as against him for lack of personal jurisdiction, and (2) defendant Banco Progreso, S.A.C.A.'s ("BPSACA") motion to dismiss the complaint as against it for (a) failure to plead with particularity, (b) invalid service of process, and (c) lack of subject matter jurisdiction. For the reasons stated herein, (1) defendant Lanauze's motion is granted in its entirety, and (2) defendant BPSACA's motion is granted in part and denied in part.

### FACTUAL BACKGROUND[1]

Plaintiff James P. Daly ("Plaintiff" or "Daly") at all relevant times was and is a resident of the State and City of New York.

---

1. For the purposes of these two motions to dismiss, the facts as alleged in the complaint are deemed to be true. *See Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991).

(Complaint at ¶ 2.) Defendants Orlando Castro Llanes ("Castro Llanes"), Orlando Castro Castro ("Castro Castro"), and Jorge Castro Barredo ("Castro Barredo") are individuals presently incarcerated in the State of New York. (*Id.* at ¶¶ 3, 4, 5.) Castro Llanes is the father of Castro Castro, and the grandfather of Castro Barredo. (*Id.* at ¶ 14.) Plaintiff alleges that these three defendants (the "Castro Defendants") owned and operated various banks, financial services, businesses, and insurance companies in Venezuela, Puerto Rico, and the Dominican Republic. (*Id.* at ¶ 13.)

Defendant BPSACA was a business entity authorized under the laws of Venezuela to engage in banking and the provision of financial services. (*Id.* at ¶ 9.) Plaintiff alleges that, at the time of the events complained of, the Castro Defendants owned and controlled BPSACA and BPSACA's wholly owned subsidiary codefendant Banco Progreso Internacional de Puerto Rico ("BPIPR"). (*Id.* at ¶¶ 16, 17, 21.) BPIPR was a business entity authorized under the laws of Puerto Rico to engage in banking and the provision of financial services. (*Id.* at ¶¶ 8, 17.)

Castro Castro was the president and director of various businesses owned by the Castro family, including BPSACA. (*Id.* at ¶ 17.) Castro Barredo also acted as president and director of various businesses owned by the Castro family, including BPIPR. (*Id.* at ¶ 18.) Defendant Calixto E. Lanauze, an individual residing in Puerto Rico, was the Executive Vice President of BPIPR. (*Id.* at ¶¶ 6, 18.) Defendant Nereida H. Brito Vegas ("Brito"), an individual residing in Caracas, Venezuela, acted as BPIPR's Operations Manager. (*Id.* at ¶¶ 7, 20.)

Plaintiff and Ramon Gimeno ("Gimeno") deposited funds into BPSACA in December, 1992, at which time BPSACA correctly listed the accounts in the name of Gimeno, or jointly in the names of Daly and Gimeno. (Plaintiff's Rico Statement ("Pl.'s RICO") at 1, 2, 4.) The funds, with plaintiff's and Gimeno's consent, were then transferred to BPSACA's subsidiary BPIPR by defendant Brito, the Manager of Operations of BPIPR, in October, 1993. (*Id.* at 1, 2, 4.)

Between April, 1993 and September, 1994, BPSACA and/or BPIPR mailed monthly statements of accounts to plaintiff and Gimeno, which represented that the funds were secure and accruing interest. (*Id.* at 4.) Defendants also represented to plaintiff and Gimeno that BPIPR was a financial institution that would make high quality and safe investments for plaintiff and Gimeno, and that the bank would provide services including loans and checking accounts. (Complaint at ¶¶ 23, 25.) Defendants further represented to plaintiff and Gimeno that Puerto Rico, and BPIPR by implication, were stable, used the United States Dollar as currency, and afforded greater regulation of banks than other off-shore financial centers. (*Id.* at ¶ 24.)

Plaintiff alleges that defendants did not maintain a secure and sound bank with highly regulated and safe investments. (*Id.* at ¶ 26.) Rather, the Castro Defendants illegally withdrew funds from Daly's, Gimeno's and other depositors' accounts for their personal use, as set forth below. (Pl.'s RICO at 2, 3.) For example, in November, 1993, plaintiff alleges that Castro Barredo withdrew over $50,000 from BPIPR, and in February and March, 1994, Castro Castro and Castro Barredo, respectively, unlawfully removed over $1,000,000 each from BPIPR. (*Id.* at 4.) Despite these withdrawals, on September 1, 1994, defendant Lanauze sent a letter on BPIPR letterhead to customers of BPIPR, including plaintiff and Gimeno, representing that BPIPR was a sound financial institution, and solicited greater use of its services by customers. (*Id.*)

Plaintiff alleges that the Castro Defendants used the proceeds from these and other fraudulent transfers for their personal use and investment in other Castro family enterprises engaged in foreign and interstate commerce. (*Id.* at 7.) Plaintiff alleges that, while representing to plaintiff and Gimeno that the funds were in Puerto Rico, defendants were simultaneously informing regulators and auditors that the funds were in Panama. (Complaint at ¶ 28.) Plaintiff alleges that depositors' funds, including those of plaintiff and Gimeno, were placed into speculative investments and high risk option trading,

resulting ultimately in losses of over six million dollars. (*Id.* at ¶¶ 29, 30.)

Plaintiff alleges that Daly's name was dropped from the accounts at BPIPR, and that Brito, aware of this fact, effectively delayed and ultimately thwarted Daly's attempts to settle the accounts and withdraw the funds from BPIPR. (Pl.'s RICO at 2, 3.) In January, 1995, "in response to Daly's attorney's several requests for release of funds, BPIPR's attorneys advised [him] only that they had 'resigned' as BPIPR's counsel." (*Id.*) On March 3, 1995, BPIPR's receiver informed Daly's attorney that, as of January 25, 1995, the Financial Institutions Commission of Puerto Rico had ordered the receivership and liquidation of BPIPR. (*Id.*) BPIPR's depositors had lost over $15,000,000 by that date. (*Id.*)

Plaintiff represents that the Castro Defendants were each convicted in New York State courts, and are all currently incarcerated in the state of New York as a result of the aforementioned activities. (*Id.* at 5; Complaint at ¶¶ 3, 4, 5.) Plaintiff alleges that his and Gimeno's damages attributable to the unlawful and fraudulent actions on the part of defendants are $231,738.73 plus interest. (Complaint at ¶ 10.)

Plaintiff filed the present action, on behalf of himself and as executor of decedent Gimeno's estate, seeking to recover the funds that he was unable to remove from BPIPR, and triple damages for the alleged RICO violations. The complaint alleges that defendant Castro Llanes, as head of the Castro family business network, acted in concert with the other Castro defendants to defraud plaintiff and decedent Gimeno, under circumstances where the non-Castro defendants knew or should have known of the fraud. (Pl.'s RICO at 1–2.) Plaintiff alleges that BPSACA, wholly owned by the Castro Defendants, participated in defendants' fraudulent conversion of plaintiff's and Gimeno's funds. (*Id.*) Plaintiff further alleges that BPIPR, wholly owned in turn by BPSACA, was used by the Castro Defendants as a front for their fraudulent activities, and was an instrumentality

for their unlawful conversion of plaintiff's and Gimeno's funds. (*Id.*)

The complaint asserts liability on the part of defendants on five legal bases: (1) the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*; (2) conversion; (3) fraud; (4) misappropriation and unjust enrichment; and (5) the common law of contracts.

## DISCUSSION

### 1. DEFENDANT LANAUZE'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Defendant Lanauze moves to dismiss the complaint as against him for lack of jurisdiction over the person under Federal Rule of Procedure 12(b)(2).[2] On a motion to dismiss pursuant to Rule 12(b)(2), all pleadings and affidavits must be construed in the light most favorable to the plaintiff, and all doubts resolved in that party's favor. *Herbstein v. Bruetman,* 768 F.Supp. 79, 81 (S.D.N.Y. 1991), *citing CutCo Indus., Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986). In order to "withstand a 12(b)(2) motion to dismiss, a plaintiff need only make out a prima facie case of personal jurisdiction." *Id.* (citing *Beacon Enterprises, Inc. v. Menzies,* 715 F.2d 757, 768 (2d Cir.1983)).

Federal Rule of Civil Procedure 4(k) provides that service of a summons is effective to establish jurisdiction over the person of a defendant if, *inter alia,* that defendant "(A) could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located, or ... (D) when authorized by a statute of the United States."

The New York long arm statute exerts jurisdiction over a non-domiciliary who:

(1) transacts business within the state ...; (2) commits a tortious act ... within the state; (3) commits a tortious act ... outside the state causing injury to person or property within the state, if such nondomiciliary regularly does or solicits business,

---

**2.** Although defendant Lanauze never explicitly cites Rule 12(b)(2) which permits a motion to dismiss for "lack of jurisdiction over the person," his motion entitled "Motion to Dismiss for Lack of Personal Jurisdiction" is deemed to have been made under this Rule.

or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in state; or (4) owns, uses, or possesses real property within state.

N.Y.C.P.L.R. § 302(a) (McKinney 1990).

■ Defendant Lanauze did not transact business within New York under § 302(a)(1). "A nondomiciliary 'transacts business' under CPLR 302(a)(1) only if he 'purposefully avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws.'" *See CutCo*, 806 F.2d at 365 (citing *McKee Electric Co. v. Rauland–Borg Corp.*, 20 N.Y.2d 377, 283 N.Y.S.2d 34, 229 N.E.2d 604 (1967) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958))). Plaintiff has failed to present any evidence that Lanauze transacted any business or entered into any contract in New York. The only contact alleged by plaintiff, the letter sent to plaintiff soliciting continued use of BPIPR's services in Puerto Rico, is insufficient alone to confer jurisdiction over Lanauze. *Cf. Fiedler v. First City National Bank of Houston*, 807 F.2d 315 (2d Cir.1986) (holding two telephone calls and a mailing from out of state insufficient to establish jurisdiction under C.P.L.R. § 302(a)(1)). There is no evidence that Lanauze either transacted business in New York on his own behalf or for others, or that he sought to take advantage of the benefits and protections of New York law. The Court finds that Lanauze did not transact any business in New York or invoke the protection or benefits of New York law sufficient to grant jurisdiction under C.P.L.R. § 302(a)(1).

Lanauze is not subject to personal jurisdiction under sections 302(a)(2), 302(a)(3), or 302(a)(4). He has not committed a tortious act within New York. "Telephone calls placed, and letters mailed from, outside the state into New York do not constitute tortious acts committed 'within the state' for purposes of § 302(a)." *See Cleft of the Rock Foundation v. Wilson*, 992 F.Supp. 574, 583 (E.D.N.Y.1998). Further, plaintiff alleges no regular course of business dealings by Lanauze sufficient to confer jurisdiction over him under § 302(a)(3). Finally, plaintiff does not allege that Lanauze owns or uses any real property in the State of New York.

Plaintiff does not rest his assertion of jurisdiction on the New York long arm statute. Rather, he asserts that the statutory service provision of RICO is sufficient to confer jurisdiction over Lanauze. Section 1965 of RICO provides that:

(a) Any civil action ... under this chapter ... may be instituted in the district court ... for any district in which such person resides, is found, has an agent, or transacts his affairs.

(b) In any action under § 1964 of this chapter ... in any district court ... *in which it is shown that the ends of justice require* that other parties residing in any other district be brought before this court, the court may cause such parties to be summoned ... and process ... may be served *in any judicial district* .... (emphasis added).

18 U.S.C. §§ 1965(a), (b).

Plaintiff asserts that Lanauze is subject to suit in New York under either § 1965(a) or § 1965(b). The RICO service provisions were recently considered by the Second Circuit in *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 71 (2d Cir.1998), a decision which makes clear that section 1965(a) does not confer jurisdiction over Lanauze. A district court has been afforded personal jurisdiction, under this section, only over a single defendant in a RICO action, in the district in which that defendant resides, has an agent, or transacts his or her affairs. *Id.* "In other words, a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant." *Id.* There is no dispute that plaintiff's action may be brought in the Southern District of New York based on the acts of the Castro Defendants who were allegedly responsible for criminal transactions in New York County. (Plaintiff's Memorandum of Law in Opposition to Defendant Calixto E. Lanauze's Motion to Dismiss the Complaint ("Pl .Opp. Lanauze" at 5.))

■ Section 1965(a), however, does not grant jurisdiction over a defendant who was

not found, did not reside, and did not transact his affairs or the affairs of the alleged RICO enterprise in New York. Plaintiff contends that, because Lanauze was allegedly aware of the Castro family's and BPIPR's transactions in New York, he has thus "transacted his affairs" in New York. (Pl.'s Opp. Lanauze at 5.) The law, however, requires more than an awareness of the actions of others. Lanauze's limited actions in this case, all of which took place outside of New York or which are alleged to have constituted only an awareness of the acts of others, are not sufficient to support a finding that he has transacted his affairs or business in the Southern District of New York.

Section 1965(b) does provide for nationwide service of process, and authorizes an assertion of jurisdiction over codefendants who are subject to the jurisdiction of the United States, even if they do not satisfy § 1965(a). However, *PT United Can* explains that the RICO statute "does *not* provide for nationwide personal jurisdiction over every defendant in every civil RICO case, no matter where the defendant is found." *Id.* at 71 (emphasis added). Rather, this section provides for national service of process only, as plaintiff concedes, if the "ends of justice [so] require." *See PT United Can,* 138 F.3d at 71; 18 U.S.C. § 1365(b); Pl.Opp. Lanauze at 5–6. The phrase "ends of justice require" has been interpreted to mean that § 1965(b) authorizes an assertion of personal jurisdiction if, otherwise, the entire RICO claim could not be tried in one civil action. *See PT United Can Co. v. Crown Cork & Seal Co.,* 1997 WL 31194 at *4 (S.D.N.Y. Jan.28, 1997) (JGK) (district court decision) (relying on *Butcher's Union Local No. 498, United Food and Commercial Workers v. SDC Investment, Inc.,* 788 F.2d 535, 538–39 (9th Cir. 1986)). *Cf. PT United Can,* 138 F.3d at 71 n. 5 (appellate decision) (not addressing the issue because the appellant in that case had not challenged the district court's holding that the ends of justice did not require a finding of jurisdiction).

**3.** It is also worth noting that the three incarcerated Castro Defendants are not actively litigating this case, have not responded to the complaint, and are currently subject to plaintiff's pending motion for default judgments against them.

■ There is no reason why this action could not have been brought in the district of Puerto Rico which (1) would have personal jurisdiction over all the parties, (2) is the district in which at least two of the defendants reside, and (3) is where the funds at issue were supposed to have been maintained. In fact, it is clear that Puerto Rico would have been a more appropriate forum.[3] The Court therefore finds that the ends of justice do not require a finding that personal jurisdiction in the Southern District of New York exists with regard to Lanauze.

Plaintiff has failed to demonstrate that Lanauze is subject to the jurisdiction of this Court under Rule 4(k). Because Lanauze is not subject to the jurisdiction of the courts of general jurisdiction of the State of New York, plaintiff cannot assert jurisdiction over him under Rule 4(k)(A). 18 U.S.C. § 1965 does not confer jurisdiction over Lanauze; accordingly, plaintiff cannot assert jurisdiction over him under Rule 4(k)(D). Plaintiff alleges no other Rule or statute that would confer jurisdiction over Lanauze, and the Court, therefore, dismisses the complaint against Lanauze in the present action.

**2. DEFENDANT BPSACA'S MOTION TO DISMISS FOR (A) FAILURE TO PLEAD WITH PARTICULARITY (B) INVALID SERVICE OF PROCESS, AND (C) LACK OF SUBJECT MATTER JURISDICTION.**

*A. Failure to Plead with Particularity*

Defendant BPSACA moves to dismiss, pursuant to Federal Rule of Civil Procedure 9(b), the first four counts of plaintiff's complaint as against BPSACA for failure to plead with particularity. BPSACA argues that "plaintiffs have identified no statements or actions on behalf of BPSACA that they claim were fraudulent, much less given any particulars.... [P]laintiffs do not specify who they claim made fraudulent statements on behalf of BPSACA, when and where these

Therefore the only defendants participating in this case are residents of Puerto Rico and the Republic of Venezuela. Plaintiff, however, is a resident of New York.

statements were allegedly made, or why they claim that these statements were fraudulent." (Def.'s Br. at 12).

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). *See also Plount v. American Home Assurance Co., Inc.*, 668 F.Supp. 204, 206 (S.D.N.Y.1987) (holding that the concerns that require fraud to be pleaded with particularity are even more urgent in a civil RICO action). A complaint, to comply with Rule 9(b), "must adequately specify statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir.1992) (quoting *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989)). Where multiple defendants are involved, the complaint is required to describe specifically each defendant's alleged participation in the fraud. *Di-Vittorio v. Equidyne Extractive Indus., Inc.* 822 F.2d 1242, 1247 (2d Cir.1987).

 Rule 9(b) does not apply only to claims under RICO and common law fraud, but also to elements of other claims that are premised on fraud. *See O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir.1991). Plaintiff's claim of conversion, which is an unauthorized taking of property, rests on an allegation of fraudulent taking, and is therefore subject to the pleading requirements of Rule 9(b). *See Ethanol Partners Accredited v. Wiener, Zuckerbrot, Weiss & Brecher*, 635 F.Supp. 18, 22 (E.D.Pa.1985). Similarly, plaintiff's claim of misappropriation and unjust enrichment asserts that "[d]efendants induced Daly and Gimeno to deposit funds with them under the false pretense that the money would be handled safely in a prudent manner." (Complaint at ¶ 63.) This claim is also premised on fraud, and is subject to Rule 9(b).[4]

Plaintiff does not explicitly dispute that Rule 9(b) applies to the first four counts of

his complaint, but rather contends that he has pleaded with sufficient particularity by pleading the fraudulent conduct of the individual defendants, plus the close relationships among the defendant banks, principal officers and key employees. Plaintiff's opposition papers identify specific fraudulent statements by the individual defendants, (Pl.'s RICO at 1-4), and also note that collateral estoppel will prevent the Castro Defendants from denying that they committed fraud.

 The first four counts of plaintiff's complaint are, however, insufficient to survive Rule 9(b) with respect to BPSACA. Plaintiff does not identify with particularity statements made by BPSACA that he alleges are fraudulent. Nor does plaintiff allege with particularity that any individual made fraudulent statements on behalf of BPSACA at any time. Merely pleading a close relationship with another entity that is alleged to have made particular misleading statements is insufficient to satisfy Rule 9(b) and *DiVittorio's* requirement that "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio*, 822 F.2d at 1247.

Further, the fraudulent activities complained of by plaintiff essentially occurred while the deposits were at BPIPR. For example, plaintiff concedes that the deposits were listed correctly in his and/or Gimeno's names while at BPSACA, and that he consented to the transfer of funds to BPIPR. (Pl.'s RICO at 2). The allegations of misrepresentation predominantly have to do with statements and conduct that occurred while the funds were at BPIPR in Puerto Rico. The Court therefore grants the motion under Federal Rule of Procedure 9(b) and dismisses the first four counts of plaintiff's complaint with respect to defendant BPSACA.

## B. Invalid Service of Process

Defendant BPSACA moves to dismiss the complaint as against it pursuant to Federal Rule of Civil Procedure 12(b)(5) for insuffi-

---

**4.** Defendant does not attempt to argue that plaintiff's claim based on breach of contract is covered by Rule 9(b). Rather, plaintiff's breach of contract claim is premised on BPSACA's failure to make good on its promise to return the deposited funds.

cient service of process. BPSACA alleges that it must be deemed by this Court to be a foreign state, and thus process must be served pursuant to the Foreign Sovereign Immunities Act ("FSIA"). The Court declines to dismiss the complaint on this basis.

BPSACA contends that, because it is currently wholly owned by an agency of the Republic of Venezuela, it is a foreign state under the FSIA. The definition of a foreign state under the FSIA includes all governmental units of the foreign government, including any entity "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." *O'Connell Machinery Co., Inc. v. M.V. Americana,* 734 F.2d 115, 116 (2d Cir. 1984); 28 U.S.C. § 1603(b)(2). A brief history of BPSACA since the events detailed in the complaint will illustrate why BPSACA contends that it falls under this definition.

BPSACA, at the time of the events detailed in the complaint, was allegedly a Venezuelan bank wholly owned by the Castro family. However, after suffering severe cash flow problems, BPSACA presented a rehabilitation plan to an agency of the Venezuelan government called the Fondo de Garantia de Depositos y Proteccion Bancaria ("FOGADE"). (Declaration of Manuela Daris Nunez ("Nunez Decl.") at ¶¶ 2, 3.) FOGADE is responsible for providing deposit insurance to the Venezuelan public for banks located in Venezuela, and loans to troubled Venezuelan financial institutions. (*Id.* at ¶ 3.) Its function is analogous to that of the United States Federal Deposit Insurance Corporation. (Memorandum in Support of Defendant Banco Progreso, S.A.C.A.'s Motion to Dismiss ("BPSACA Mem .") at 2.)

FOGADE instituted a trust contract, with a state-controlled bank acting as trustee, and delivered to BPSACA a loan in order to keep it functioning. (Nunoz Decl. at ¶ 3.) BPSACA and its related commercial companies guaranteed the loan in the event of default by BPSACA and provided assets for the trust with FOGADE as beneficiary. (*Id.*) BPSACA subsequently defaulted on the loan, and the trust was dissolved and the assets delivered to FOGADE. (*Id.*)

On December 13, 1994, as BPSACA's liquidity problems continued, FOGADE acquired 100% of Banco Progreso's shares. As of January 10, 1995, all of BPSACA's deposits were transferred to other public financial institutions. (*Id.* at ¶ 4.) FOGADE also assumed all of the liabilities of BPSACA and its financial businesses located in Venezuela, and received a right of subrogation to all of BPSACA's assets. (*Id.*) BPSACA likely will soon be liquidated. (*Id.;* BPSACA Mem. at 2.)

Federal Rule of Civil Procedure 4(j)(1) states that "[s]ervice of process upon a foreign state or a political subdivision, agency, or instrumentality thereof shall be effected pursuant to 28 U.S.C. § 1608 [the FSIA]." Section 1608(b) of the FSIA provides that service of process on agencies and instrumentalities of foreign states may be effected in a number of ways:

(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service of process between the plaintiff and the agency or instrumentality; or

(2) if no special arrangement exists, by [service on an authorized agent within the United States under certain circumstances]; or in accordance with an applicable international convention on service of judicial documents; or

(3) *if service cannot be made under paragraphs (1) and (2),* and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state ...
(A) as directed by an authority of the foreign state or political subdivision thereof in response to a letter rogatory, or (B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or (C) as directed by order of the court consistent with the law of the place service is to be made. (emphasis added). 28 U.S.C. § 1608(b).

 Service was effected on BPSACA by means of personal delivery of the summons and complaint to FOGADE at its office in

Caracas, Venezuela. (Declaration of Randall D. Bartlett, Esq.) Such service complies with none of the sections above. There is no evidence or allegation of any special arrangement between plaintiff and BPSACA. Defendant also contends that the Republic of Venezuela is signatory to two international conventions: plaintiff does not submit that he has complied with either of these conventions, which generally would have required the use of letters rogatory and the service of a Spanish language translation.[5] Plaintiff has not complied with § 1608(B)(3) because he did not serve a copy of the summons and complaint in Spanish. Further, the language of the statute appears to imply that § 1608(B)(3) is only available if service cannot be performed under the earlier two sections, and plaintiff has not produced any evidence suggesting that service under § 1608(B)(2) is impossible or impractical.

Plaintiff virtually concedes inadequate service of process in his memorandum of law, arguing instead that "[h]aving received . . . actual notice, BPSACA should not insist on the 'rigid, technical, [and] cumbersome procedure,'" required by the FSIA. (Plaintiff's Memorandum of Law in Opposition to Banco Progreso S.A.C.A.'s Motion to Dismiss the Complaint ("Pl.'s Opp. BPSACA") at 7. (citing *Montanez Miranda v. Banco Progreso*, 973 F.Supp. 89 (D.P.R.1997) (quoting *Velidor v. L/P/G Benghazi*, 653 F.2d 812 (3d Cir. 1981))).

 "[W]hen the sufficiency of service of process is challenged, 'the party on whose behalf service is made has the burden of establishing its validity.'" *See Seramur v. Saudi Arabian Airlines*, 934 F.Supp. 48, 50 (E.D.N.Y.1996) (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1353 ("Wright & Miller"), at 283 (1990)). Despite plaintiff's protestations to the contrary, "[s]ection 1608(b) provides the exclusive means by which service of process may be effectuated" on a foreign state. *Id.* at 51. *Cf. Lippus v. Dahlgren Mfg. Co.*, 644 F.Supp. 1473, 1477 (E.D.N.Y.1986) ("allowing

service by methods other than those prescribed by the FSIA would vitiate the clear intent of Congress to reserve to federal law the exclusive method for service of process.") Plaintiff's memorandum of law fails to make a showing that he has complied or attempted to comply with the FSIA, nor does he contend that the FSIA is not applicable. If courts permitted plaintiffs to routinely avoid compliance with the FSIA's service requirements, an important purpose of this statute and of numerous international conventions would be rendered meaningless.

 However, in the interests of justice, this Court finds it unnecessary to dismiss the complaint against BPSACA at this point. *Cf. Vorhees v. Fischer & Krecke*, 697 F.2d 574 (4th Cir.1983) (holding that the district court should not have dismissed the action for invalid service of process under the Hague Convention until the plaintiffs were given a reasonable opportunity to attempt to effect valid service of process on the defendant in a manner complying with the convention.).

As Judge Wexler stated in *Lippus:*

Although the Court cannot understand why plaintiffs never complied with the plain language of [the FSIA] . . . allowing them to perfect service at this time ensures compliance with the words and spirit of the FSIA and allows the lawsuit to go forward. It is uncontested that [defendants] have long had actual notice of the lawsuit . . . [defendant] has participated in the lawsuit through counsel. . . . Furthermore, service defects appear readily curable and . . . there is little tangible prejudice to [defendant].

*See Lippus*, 644 F.Supp. at 1479 (citing Fed. R.Civ.P. 4(h); Wright & Miller § 1131). Judge Wexler denied the defendant's motion to dismiss for insufficiency of process and required that plaintiff effect proper service on defendant within thirty days of his order. *Id. See also Shell Oil Co. v. M/V Itanage*, 830 F.Supp. 1423, 1425 (M.D.Fl.1993) (allowing

---

5. *See* Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, *reprinted in* 28 U.S.C.A. following Fed. R.Civ.P. 4 (West Supp.1995); Inter–American

Convention on Letters Rogatory, Jan. 30, 1975, and the Additional Protocol to the Inter–American Convention on Letters Rogatory, May 8, 1979, S. Treaty Doc. No. 98–27, 58 Fed.Reg. 31, 132 (1988); (BPSACA Mem. at 6 .)

plaintiff, as in *Lippus*, 30 days to re-serve properly under the FSIA).

The same considerations apply in this case. Defendant, through counsel, has participated in the suit in a similar manner as in *Lippus*, and there is no argument of prejudice to BPSACA. The Court will afford plaintiff 30 days in which to effect proper service of process on BPSACA pursuant to the provisions of the FSIA.

### C. Lack of Subject Matter Jurisdiction

BPSACA also moves to dismiss the complaint as against it under Federal Rule of Civil Procedure 12(b)(1), lack of subject matter jurisdiction. BPSACA argues that this court lacks jurisdiction because BPSACA is immune from civil suit in United States courts as an instrumentality of a foreign state under the FSIA.

The FSIA provides a statutory scheme for determining whether a court has subject matter jurisdiction over a claim against a foreign state, agency, or instrumentality. *See* 28 U.S.C. §§ 1602 et seq.; 28 U.S.C. § 1330. Foreign states are presumptively immune from suit, and United States federal and state courts lack subject matter jurisdiction, unless the claims fall within one of the FSIA's special exceptions. *See* 28 U.S.C. §§ 1605 – 1607, 1330; *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488–89, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). BPSACA asserts, and plaintiff does not dispute,

that BPSACA is a foreign state under the FSIA because it is an entity "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof...." *O'Connell Machinery Co., Inc. v. M.V. Americana*, 734 F.2d 115, 116–117 (2d Cir.1984).

▪ A foreign state, however, is not afforded immunity from suits alleging wrongs relating to the state's commercial activities under the "commercial activities exception" to foreign sovereign immunity. 28 U.S.C. § 1605(a)(2). *See e.g., Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (allowing Argentina to be sued for payment on bonds issued as part of a currency stabilization plan). Commercial activities in this context involve actions by states that exercise "only those powers that can also be exercised by private citizens," as opposed to "powers peculiar to sovereigns." *See Saudi Arabia v. Nelson*, 507 U.S. 349, 360, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). "The purpose of the commercial [activities] exception [is] to prevent foreign states from taking refuge behind their sovereignty when they act as market participants...." *Id.* at 368, 113 S.Ct. 1471 (1993) (Kennedy, J., concurring in part and dissenting in part).

▪ At least insofar as plaintiff is asserting a breach of contract claim,[6] we hold that the activities underlying the suit are commercial activities under the FSIA because (1)

---

6. Issues of immunity under the first four fraud-related counts of the complaint are more complicated than for the breach of contract claim. BPSACA refers to the provision of the FSIA that states that sovereign immunity will remain for "any claim arising out of malicious prosecution, abuse of process, libel, slander, *misrepresentation, deceit,* or interference with contract rights." *See* 28 U.S.C. § 1605(a)(5)(B) (emphasis added). The first four counts of plaintiff's complaint are premised on fraudulent representations. There is some dispute as to whether the "exception to the exception" of 1605(a)(5)(B) modifies only the "tortious act exception" that directly precedes it at § 1605(a)(5), or whether it also affects the "commercial activities" exception of § 1605(a)(2). BPSACA argues that § 1605(a)(5)(B) bars *any* suit based on misrepresentation and deceit, even commercially-based fraud actions that would otherwise be entitled to the benefit of the commercial activities exception of § 1605(a)(2). *See Bryks v. Canadian Broad-*

*casting Corp.*, 906 F.Supp. 204 (S.D.N.Y.1995) (refusing to permit a defamation case to proceed against a foreign state, even if the suit was commercial in character, because defamation is listed among the exclusions in § 1605(b)(5)) (Mukasey, J.). *But see Yucyco, Ltd. v. Republic of Slovenia*, 984 F.Supp. 209, 224 (S.D.N.Y.1997) ("Because established canons of statutory construction generally require that an exception be considered a limitation only upon the matter which directly precedes it, subsection (a)(5)(B) should be read to limit only the reach of the noncommercial torts exception, and should not be construed to otherwise modify the exceptions set forth in subsections (a)(1)–(4).") (Chin, J.). Because we dismiss the first four counts of the complaint against BPSACA for failure to plead fraud with particularity, we need not address this issue. The analysis in this section on "commercial activities" will therefore deal *solely* with the breach of contract claim asserted by plaintiff in his fifth count.

the facts underlying the complaint are commercial in character, and (2) the policies underlying the FSIA do not require immunity in this action.

Whether an activity is commercial under the FSIA is determined "by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). "[T]he issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.'" See Weltover, 504 U.S. at 614, 112 S.Ct. 2160.

Plaintiff is seeking the return of funds that were deposited in the defendant bank on a purely commercial basis. It can hardly be argued that accepting bank deposits in this context is not an act of a commercial character. Common banking activities are not ordinarily exclusively within the "peculiar powers" of a sovereign, and these activities are precisely the type of actions by which a private party can be understood to be engaging in "trade and commerce." See also Maizus v. Weldor Trust Reg., 820 F.Supp. 101, 104 (S.D.N.Y.1993) ("nor can any colorable claim be made that [defendant Central Bank of Nigeria's] receipt of a bank deposit was not commercial activity within the meaning of section 1603(d) of the FSIA."); De Letelier v. Republic of Chile, 748 F.2d 790, 797 (2d Cir.1984) (holding an activity to be commercial under the FSIA if it "is of a type an individual would customarily carry on for profit").

BPSACA cites Montanez Miranda v. Banco Progreso, S.A.C.A., 973 F.Supp. 89 (D.P.R. 1997) in support of its position that the circumstances here do not fall under the commercial activities exception. Miranda involved very similar allegations arising out of the same fraudulent transfers by the Castro family, and held that the commercial activities exception did not apply to BPSACA. In Miranda, FOGADE was added as a named defendant, and the court's analysis primarily focused on whether FOGADE was immune

from suit. See id. at 94. The court concluded that FOGADE itself was immune because the activities underlying its involvement in the case consisted of its management of BPSACA's assets and acquisition of BPSACA's shares, as directed by the Venezuelan legislature, in order to help stabilize the Venezuelan financial system during an emergency situation. Id. The court understandably found these activities by FOGADE to be of a "public nature." Id. However, the Miranda court, without referring to any authority for its finding, then concluded that all of the other commercial bank defendants acquired by FOGADE were also immune from suit. See id. To the extent that FOGADE is not a defendant in the present action, Miranda is distinguishable from this case.

This Court concludes that, while FOGADE's intervention in the Venezuelan financial industry may have been a "public act" entitled to immunity, it does not follow that the underlying activities of BPSACA in accepting bank deposits and contracting to safeguard those funds were also "peculiarly sovereign" and non-commercial in their nature. This Court finds that the activities of BPSACA were manifestly commercial in nature.

This conclusion is reinforced by the policies underlying the FSIA, which do not call for immunity in a situation such as this where the activities underlying the complaint were all committed by the defendant and its owners when the defendant was not a state entity but rather was a private, commercial bank. In Nordberg v. Granfinanciera, S.A. (In re Chase & Sanborn Corp.), 835 F.2d 1341, 1347–48 (11th Cir.1988), reversed on other grounds, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), the Eleventh Circuit concluded that the FSIA did not apply to a bank that had been nationalized by the Colombian government after the events underlying the complaint had occurred. The court concluded that the defendant "was not an instrumentality of the Colombian government at the time of the transactions and thus would not be protected by the provisions of the FSIA." See id.[7] See also Gould, Inc. v.

---

**7.** In Granfinanciera, unlike the present case, the civil action was filed before the nationalization of

the defendant. See Granfinanciera, 835 F.2d 1341, 1347–48 ("FSIA is inapplicable to the case

*Pechiney Ugine Kuhlmann,* 853 F.2d 445 (6th Cir.1988) ("It would appear that the determination of whether a party is subject to the court's jurisdiction ... should be based upon a party's status at the time the act complained of occurred."); *General Elec. Capital Corp. v. Grossman,* 991 F.2d 1376 (8th Cir.1993) (permitting FSIA to apply when entity was public at time of alleged wrong, but privatized before suit).[8]

The FSIA was intended to give immunity only to acts of foreign entities that, at the time of those acts, are carried out by instrumentalities of a foreign state acting in a public and governmental role. *Cf. Hanil Bank v. PT. Bank Negara Indonesia,* 148 F.3d 127, 131 (2d Cir.1998) ("A state engages in 'commercial activity' for purposes of the FSIA where it acts not in its governmental or public role, but rather like a private player in the marketplace.") This principle requires a focus, at least for the purposes of applying civil immunity to those acts,[9] on the status of the foreign entity at the time of the alleged acts, not at a later or earlier date.

The above considerations are compounded in this case by the irrationality of permitting a foreign commercial entity to have its allegedly unlawful conduct insulated from liability simply by transferring its assets to its government in anticipation of being sued. Plaintiff argues in his memorandum of law that "*Miranda* was incorrectly decided to the extent that it did not distinguish FOGADE's public ... acts from the commercial activities of BPSACA before it came under FOGADE's control ... [this] leads to the untenable proposition that a subsequent acquisition of a private financial institution by a government

agency immunizes that institution from its prior acts." (Pl.'s Opp. BPSACA at 6 n. 2) This Court finds that reasoning persuasive.

We are persuaded, therefore, both by the nature of the conduct at issue and the status of the entity involved at the time of the alleged conduct that the predicate acts complained of by plaintiff in this action were indeed "commercial activities" under the FSIA. Therefore, BPSACA is not entitled to immunity from plaintiff's breach of contract claim.

In sum, we find that defendant Lanauze is not subject to the personal jurisdiction of this court and that the complaint must be dismissed as against him. We also find that plaintiff has failed to plead the first four counts of his complaint, which are premised on fraud, with sufficient particularity under Rule 9(b) with respect to defendant BPSACA. We further find that plaintiff failed to comply with the requirements under the FSIA for serving BPSACA, but that it would be appropriate to afford plaintiff additional time to effect service before dismissing the complaint against BPSACA on that basis. Last, we find that the fifth count of plaintiff's complaint, for breach of contract, may proceed as soon as BPSACA is properly served with process, and that BPSACA is not entitled to foreign sovereign immunity under the FSIA because the alleged acts underlying this cause of action in the complaint were commercial activities.

## CONCLUSION

For the reasons stated above,

---

at bar because the transfers in question and the suit to recover those transfers occurred before Granfinanciera was nationalized."). The language cited above, however, illustrates that the case focuses on the time of the transaction, not the time of suit. *See id.,* 835 F.2d at 1347–48. *But see Straub v. A P Green, Inc.,* 38 F.3d 448, 449 (9th Cir.1994) (concluding that, in the context of service of process, whether the FSIA applies depends on whether the defendant is a foreign state at the time of suit).

**8.** We need not decide the broader question of whether BPSACA is a foreign state under the FSIA because (1) plaintiff has not challenged the assertion that BPSACA is a foreign state, and (2)

a contrary finding would not change the result reached here with regard to immunity because the activities involved in this case were manifestly commercial in nature. It is sufficient to note that the case law suggests a diminished importance of the FSIA in the context of protecting entities that were not publicly owned at the time of the events underlying the complaint. *See Granfinanciera, supra; Gould, supra.*

**9.** Whether the events underlying the complaint took place before the defendant was acquired or taken over by a state entity is arguably less important for the purposes of the FSIA's service of process requirements.

(1) defendant Lanauze's motion to dismiss the complaint as against him under Rule 12(b)(2) is GRANTED in its entirety;

(2) defendant BPSACA's motion to dismiss

(a) plaintiff's claims against it based on RICO, common law fraud, conversion, and misappropriation, for failure to plead fraud with particularity under Fed.R.Civ.P. 9(b) is GRANTED;

(b) the complaint as against it for failure to properly serve process under Rule 12(b)(5) is DENIED;

(c) the complaint for lack of subject matter jurisdiction under Rule 12(b)(1) is DENIED;

(3) plaintiff is granted 30 days to re-serve BPSACA pursuant to the FSIA, after which time if plaintiff has not complied, defendant may renew its motion to dismiss under Rule 12(b)(5).

SO ORDERED.