**AMUSEMENT INDUSTRY, INC. dba Westland Industries; and Practical Finance Co., Inc., Plaintiffs,**

v.

**Moses STERN, aka Mark Stern; Joshua Safrin; Avery Egert; First Republic Group Realty LLC; Ephraim Frenkel; First Republic Group, Corp., and Land Title Associates Escrow, Defendants.**

**No. 07 Civ. 11586(LAK).**

United States District Court, S.D. New York.

March 1, 2010.

Allen Phillip Sragow, Sragow & Sragow, Long Beach, CA, Eugene R. Scheiman, Arent Fox LLP, Philip R. White, Sills Cummis & Gross, P.C., Marc David Youngelson, Sills Cummis & Gross, P.C., Mark Alan Bloom, Arent Fox LLP, New York, NY, David William Kiefer, Sills Cummis & Gross, P.C., Newark, NJ, for Plaintiffs.

Stephen R. Stern, Mark W. Geisler, Philip S. Ross, Hoffinger Stern & Ross LLP, Justin Y.K. Chu, Martin I. Kaminsky, McCarter & English, LLP, New York, NY, Nathan D. Adler, Neuberger, Quinn, Gielen, Rubin & Gibber, P.A., Baltimore, MD, for Defendants.

## CORRECTED ORDER

LEWIS A. KAPLAN, District Judge.

The motion of defendants Joshua Safrin and Avery Egert to dismiss the amended complaint as against them [DI 266], which has been made applicable to the second amended complaint, is granted to the extent that (1) the fraud claims based on the statements alleged in paragraphs 72, 74(g) and 75 of the amended complaint, (2) the negligent misrepresentation claim, (3) the claim for a constructive trust under Alabama law, (4) the claim for an equitable lien under Virginia law, and (5) the declaratory judgment claim all are dismissed. It is denied in all other respects. This ruling is made substantially for the reasons stated in Judge Gorenstein's report and recommendation [DI 354] to which no objection has been filed.

SO ORDERED.

## *REPORT AND RECOMMENDATION*

GABRIEL W. GORENSTEIN, United States Magistrate Judge.

Plaintiffs Amusement Industry, Inc. d/b/a Westland Industries, and Practical Finance Co., Inc. ("Amusement") have sued defendants Moses Stern; First Republic Group Realty LLC; First Republic Group, Corp.; Ephraim Frenkel; Land Title Associates Escrow; Joshua Safrin; and Avery Egert seeking damages arising out

of their loss of $13 million in a real estate transaction. *See* Corrected First Amended Complaint, filed May 12, 2009 (Docket # 285) ("Compl.").[1] Safrin and Egert have now moved to dismiss the claims against them. For the reasons stated below, their motion to dismiss should be granted in part and denied in part.

## I. BACKGROUND

### A. *Plaintiffs' Allegations*

Amusement alleges the following facts against Safrin and Egert, which are presumed true on a motion to dismiss. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

#### 1. *The Deal*

In April 2007, First Republic[2]—controlled solely by Moses Stern, Compl. ¶¶ 2, 12–13—entered into a written contract to purchase several shopping centers from Colonial Realty Limited Partnership (the "Portfolio"), *id.* ¶ 2. In May 2007, Stern and First Republic authorized Bankers Capital Realty Advisors ("Bankers Capital") through its principal, Steven Alevy, to secure additional financing on their behalf. *Id.* ¶¶ 21–22. Stern and First Republic also authorized an attorney, Stephen Friedman—who represented Stern, First Republic, and allegedly, Safrin and Egert—to approach Amusement regarding this same matter. *Id.* ¶¶ 22–23. Amusement is controlled by its principal, third-party defendant Allen Alevy. *Id.* ¶ 21.

#### 2. *Friedman's Representations*

Friedman, then a partner at Buchanan, Ingersoll and Rooney ("BIR"), repeatedly represented to Amusement that he had been retained and was authorized to act as an agent by Stern, First Republic, Safrin, and Egert in connection with the acquisition of the Portfolio. *Id.* ¶ 25. Amusement asserts that Friedman had either actual or apparent authority to bind Safrin and Egert as reflected in part by a retainer agreement dated October 26, 2006. *Id.* ¶ 27; Retainer letter from Stephen Friedman to Avery Egert (Oct. 26, 2006) (annexed as Ex. A to Declaration of Thomas M. Wood, IV, filed Apr. 29, 2009) (Docket # 268) ("Wood Decl.") ("Retainer letter"). On several occasions, Friedman represented to Steven Alevy that he had authority to act for Safrin, and Safrin permitted Friedman to disseminate his personal financial statements and tax returns to "interested parties" and to "procure his signature on legally significant documents." Compl. ¶ 27. Egert, who is Safrin's son-in-law, personally assured Steven Alevy that Friedman could bind Egert and Safrin, and Egert instructed Steven Alevy to "negotiate with Friedman for a larger part of the equity in the Portfolio that would come from Safrin's share." *Id.* ¶¶ 27, 74(j). In late May or early June 2007, Safrin himself told Steven Alevy that he was participating in the acquisition of the Portfolio. *Id.* ¶ 74(b).

Amusement was "enticed by Friedman's representation that Safrin, a respected

**1.** On January 21, 2010, Amusement filed a second amended complaint. *See* Second Amended Complaint, filed Jan. 21, 2010 (Docket # 347). However, none of the allegations relevant to this motion have been changed by the new pleading. In our Order dated February 2, 2010, we indicated that absent objection we would assume that the parties would apply their briefing on this motion to the second amended complaint. No party objected to this procedure. Accordingly, citations herein are to the motion papers as addressed to the Corrected First Amended Complaint.

**2.** Throughout the Corrected First Amended Complaint, Amusement refers to both "First Republic Group Realty LLC" and "First Republic Group, Corp." as simply First Republic, *id.* ¶ 2, and we do the same here.

New York real estate investor, was supplying much of the equity needed for the acquisition." *Id.* ¶ 23. Steven Alevy, of Bankers Capital, who is also the son of Amusement's Allen Alevy, *id.* ¶ 21, also confirmed that Stern had represented that "Safrin and Egert were supplying most of the equity for the acquisition," *id.* ¶ 24. Steven Alevy represented that, during a walk on West End Avenue in New York in late May or early June of 2007, "Safrin had expressed his pleasure at participating jointly with the Alevy family in acquiring the Portfolio." *Id.* On June 4, 2007, Friedman told Steven Alevy that Egert was to be placed on the advisory board of the entity acquiring the Portfolio, *id.* ¶ 74(d), and that Safrin had already been placed on the same advisory board, *id.* ¶ 74(e). On June 4–5, 2007, "Stern told Bankers Capital that Safrin was a sponsor" of the transaction, with $15–18 million liquidity and that Safrin would sign the " 'carve-outs' on the financing package." *Id.* ¶¶ 74(f)-(g). Finally, between June 20 and June 29, 2007, Friedman told Bankers Capital and Amusement that the Citigroup financing agreement permitted a 50/50 equity split between Amusement and Stern–Safrin–Egert. *Id.* ¶ 74(k).

### 3. *The Letter of Understanding and the Escrow Account*

On June 29, 2007, Amusement, relying in part on representations by Safrin and Egert with respect to their participation in the acquisition, executed a written letter of understanding ("LOU") with Stern on behalf of First Republic, *see id.* ¶¶ 29, 31; Exhibit 2 to Compl., which set forth the proposed terms of Amusement's investment, and Amusement then wired $13 million into an escrow account with Land Title Associates Escrow ("LTA") at North Fork Bank, Compl. ¶¶ 2, 31–32. Amusement assented to the escrow agreement with the understanding that the money was to be released only if Amusement so instructed. *Id.* ¶ 34. As consideration for placing the

$13 million into escrow, Amusement was to hold in escrow "100% of the equity and voting interest in the Portfolio" in Amusement's favor while the parties negotiated their final agreement. *Id.* ¶ 31(c). Stern, Friedman, LTA, and LTA's principal, Ephraim Frenkel, "acknowledged" the terms of this arrangement. *Id.* ¶ 34.

Safrin, Egert, Stern, and First Republic represented that time was of the essence, and failed to inform Amusement until "later" that Colonial had agreed to an extension of the closing date. *Id.* ¶ 30. This led Amusement to enter into the LOU relying on the defendants' representations and without conducting "proper due diligence." *Id.* ¶ 29.

### 4. *Continuing Negotiations*

The primary financing for the acquisition was based on an agreement between First Republic and Citigroup, under which Citigroup was to provide approximately $126 million to acquire the Portfolio. *Id.* ¶ 42. Amusement did not know that First Republic could not perform its obligations under the LOU "because those obligations conflicted with the terms" of the financing agreement that Stern and First Republic had with Citigroup. *Id.* ¶ 42. Between June 29 and July 14, 2007, Amusement attempted to negotiate a final agreement, but no agreement was reached. *Id.* ¶ 35. Amusement also insisted that it would not finalize the transaction without reviewing the Citigroup documents, but those documents were not provided to it. *Id.* ¶ 42. The failure of Stern, Safrin, Egert, and First Republic to supply copies of the Citigroup documents "gave Amusement false confidence that its money was safely in escrow." *Id.*

### 5. *Transfer of the Funds*

Without Amusement's knowledge or consent, the $13 million was transferred on July 3, 2007, from the escrow account to a separate North Fork Bank account owned

by First Republic. *Id.* ¶¶ 2, 40. On July 12, 2007, with knowledge of the transfer, Stern, Safrin, Egert, and First Republic sent Amusement a set of partially executed transaction documents; however, Amusement continued to negotiate and refused to release the $13 million, which it believed was still in the escrow account. *Id.* ¶¶ 22, 44. That same day, without Amusement's knowledge, and despite the fact that no agreement had been reached, Stern, Safrin, Egert, and First Republic used the $13 million to close the purchase of the Portfolio. *Id.* ¶¶ 48, 58. The defendants concealed the fact that the money had been removed from the escrow account and continued negotiations with Amusement notwithstanding their knowledge of this fact. *Id.* ¶ 75. Amusement alleges that Stern, Safrin, Egert, First Republic, Frenkel, and LTA had a duty to disclose this information, and that it relied on these omissions in continuing to negotiate a final agreement. *Id.* ¶¶ 75–77.

In an effort to get Amusement to ratify the unauthorized use of the escrow funds, Stern, on behalf of First Republic, executed and delivered to Amusement "grant deeds conveying ownership of the individual properties in the Portfolio," and assignments of Stern's and Safrin's "membership interests" in First Republic and other entities connected with the acquisition. *Id.* ¶¶ 4, 44, 45(b)-(c). These items were placed in escrow pursuant to an escrow agreement "with the attorney and agent who had been representing Stern, First Republic and Safrin"—that is, Friedman. *Id.* ¶ 4. Amusement, however, never "accepted . . . these documents and terms for the use of its $13 million." *Id.*

Amusement alleges that Safrin and Egert "aided and abetted the theft of Amusement's $13 million." *Id.* ¶ 43. It also alleges that Safrin and Egert had a "special and confidential relationship" with Amusement giving rise to a fiduciary duty to Amusement. *Id.* ¶ 43. Despite a demand from Amusement, all defendants have refused to return the $13 million. *Id.* ¶ 99.

### 6. *The Instant Action*

With respect to Safrin and Egert, Amusement has asserted claims for fraud, negligent misrepresentation, conversion, conspiracy to commit conversion and/or fraud, and unjust enrichment. In addition, Amusement seeks an equitable lien, a constructive trust, and a purchase money resulting trust over the Portfolio, and declaratory relief as to its security interest in the Portfolio properties.

### B. *The Instant Motion*

Safrin and Egert have moved to dismiss all of the claims in Amusement's amended complaint as against them for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6).[3] Safrin and Egert argue that plaintiffs have failed to: (1) allege reasonable reliance and causation in their fraud and negligent misrepresentation claims, (2) plead fraud

---

**3.** *See* Notice of Consolidated Motion to Dismiss by Defendants Joshua Safrin and Avery Egert, filed Apr. 29, 2009 (Docket # 266); Memorandum of Law in Support of Consolidated Motion to Dismiss by Defendants Joshua Safrin and Avery Egert, filed May 1, 2009 (Docket # 273) ("Def. Mem."); Wood Decl.; Plaintiffs' Memorandum of Law in Opposition to Defendants Joshua Safrin and Avery Egert's Consolidated Motion to Dismiss, filed June 2, 2009 (Docket # 288) ("Pl. Opp. Mem."); Request for Judicial Notice in Support of Plaintiffs' Opposition to Safrin/Egert's Motion to Dismiss, filed June 2, 2009 (Docket # 289) ("Request for Judicial Notice"); Reply Memorandum of Law in Further Support of Defendants Joshua Safrin's and Avery Egert's Consolidated Motion to Dismiss, filed June 19, 2009 (Docket # 296) ("Def. Reply"); Affirmation of Michael C. Rakower, filed June 19, 2009 (Docket # 297) ("Rakower Aff.").

with particularity in accordance with Fed. R.Civ.P. 9(b), (3) show that Safrin and Egert owed any duty to Amusement for purposes of the negligent misrepresentation claims, (4) plead that Friedman had actual or apparent authority to bind Safrin and Egert, (5) state a claim for conversion, (6) plead conspiracy to commit conversion and/or fraud, (7) plead that Safrin and Egert were unjustly enriched, (8) demonstrate an entitlement to an equitable lien, a constructive trust, and/or a purchase money resulting trust, and (9) demonstrate an entitlement to declaratory relief. *See* Def. Mem. at 12–44.

## II. *APPLICABLE LEGAL STANDARDS*

### A. *Failure to State a Claim*

A party may move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) where the opposing party's complaint "fail[s] to state a claim upon which relief can be granted." While a court must accept as true all of the allegations contained in a complaint, that principle does not apply to legal conclusions. *See Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (citation, internal quotation marks, and brackets omitted). In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Ashcroft,* 129 S.Ct. at 1949, and thus a court's first task is to disregard any conclusory statements in a complaint, *id.* at 1950.

Next, a court must determine if the complaint contains "sufficient factual matter" which, if accepted as true, states a claim that is "plausible on its face." *Id.* at 1949 (citation and internal quotation marks omitted); *accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007) ("a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion"). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft,* 129 S.Ct. at 1949 (citations and internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed.R.Civ.P. 8(a) because it has merely "alleged" but not "show[n] ... that the pleader is entitled to relief." *Id.* at 1950 (quoting Fed.R.Civ.P. 8(a)(2)).

■ If the allegations of a complaint show that the conduct complained of was "not only compatible with, but indeed was more likely explained by, lawful" conduct, no claim for relief is stated. *Id.* at 1950; *see also id.* at 1951 (allegations in a complaint are rejected where there is an "obvious alternative explanation" for the conduct alleged that is more "likely").

■ While a court typically examines only the allegations of a pleading on a motion to dismiss, "[d]ocuments that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (citation omitted).

### B. *Pleading Fraud with Particularity*

■ A court does not accept as true on a motion to dismiss "conclusions of law or

unwarranted deductions of fact." *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 771 (2d Cir.1994) (citation and internal quotation marks omitted), *cert. denied*, 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995). "This principle applies with even greater force in a fraud case governed by the more stringent pleading requirements of Fed.R.Civ.P. 9(b)." *Id.* Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

■ "[I]n order to comply with Rule 9(b), 'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir.2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)). While "the fraud alleged must be stated with particularity . . . the requisite intent of the alleged [perpetrator] of the fraud need not be alleged with great specificity." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) (citations omitted); *see also* Fed. R.Civ.P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Nonetheless, a plaintiff " 'must allege facts that give rise to a strong inference of fraudulent intent.'" *Lerner*, 459 F.3d at 290 (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995)).

### C. *Choice of Law*

■ We first address the threshold issue of which law should apply to Amusement's claims. Because this Court's subject matter jurisdiction is based solely upon diversity, *see* Compl. ¶ 17, we apply the choice of law rules of the forum state— here, New York. *See Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *DeWeerth v. Baldinger*, 38 F.3d 1266, 1272 (2d Cir.) (in diversity cases, the federal courts are "bound to follow state law on any matter of substantive law" (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938))), *cert. denied*, 513 U.S. 1001, 115 S.Ct. 512, 130 L.Ed.2d 419 (1994); *accord Thomas H. Lee Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F.Supp.2d 267, 283 (S.D.N.Y.2009). In a New York choice of law analysis, the court first asks "whether there is an actual conflict of laws" because if "there is no actual conflict . . . New York will dispense with a choice of law analysis." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir.1998) (citations omitted); *see also Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir.2004) (New York choice of law doctrine provides that a court is free to bypass the choice of law analysis and apply New York law in the absence of a material conflict.) (collecting cases).

However, if there is a substantive conflict between or among the laws of each jurisdiction, a conflict of laws analysis is necessary. *Curley*, 153 F.3d at 12 (citations omitted). Laws are in conflict "[w]here the applicable law from each jurisdiction provides different substantive rules." *Id.* A "material conflict" is a conflict that is likely to have "a significant possible effect" on the outcome of the case. *Simon v. Philip Morris Inc.*, 124 F.Supp.2d 46, 71 (E.D.N.Y.2000) (citing *In re Complaint of Bankers Trust Co.*, 752 F.2d 874 (3d Cir.1984)).

Where tort claims are made, New York's choice of law rules apply an " 'interest analysis' under which the law of the jurisdiction having the greatest interest in the litigation is applied." *Curley*, 153 F.3d at 12 (citing *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir.1992)).

There are two inquiries that must be made: "(1) what are the significant contacts and in which jurisdiction are they located; and (2) whether the purpose of the law is to regulate conduct or allocate loss." *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519, 521, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (1994) (citing *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 198, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985)); *accord Devore v. Pfizer Inc.*, 58 A.D.3d 138, 140–41, 867 N.Y.S.2d 425 (1st Dep't 2008). The New York choice of law rules distinguish between "conduct regulating" and "loss allocating" rules when weighing each jurisdiction's interest in seeing its law apply. *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir.1999).

### 1. *Fraud*

Amusement argues that California law should apply to its fraud claim, *see* Pl. Opp. Mem. at 7, while Safrin and Egert contend that New York law applies, *see* Def. Mem. at 12–13; Def. Reply at 3–7. Safrin and Egert have correctly argued that there is no conflict between New York and California law with respect to Amusement's fraud claim. *See* Def. Reply at 3–4. There is no actual conflict between New York and California law concerning common law fraud because the elements of the tort in each jurisdiction are "substantially similar." *Williams v. L.A. Models, Inc.*, 2008 WL 3304588, at *7 n. 32 (S.D.N.Y. Aug. 5, 2008) ("[I]t would make no difference to the instant [choice of law] analysis whether we applied New York or California law. Under California law, the elements of a claim for fraud are substantially similar ...."). *Compare Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 488, 836 N.Y.S.2d 509, 868 N.E.2d 189 (2007) (New York common law fraud elements), *with Lazar v. Superior Court*, 12 Cal.4th 631, 49 Cal.Rptr.2d 377, 909 P.2d 981, 984–85 (1996) (California common law fraud elements). Because there is no "actual conflict," Amusement's argument that Califor-

nia law should apply under an "economic impact" argument, *see* Pl. Opp. Mem. at 7, is unavailing.

### 2. *Negligent Misrepresentation*

Safrin and Egert concede that there is an actual conflict between New York and California law with respect to Amusement's claim for negligent misrepresentation because New York law requires a plaintiff to establish the additional element of a "special relationship." *Compare Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir.2000) (applying New York law), *with Small v. Fritz Cos., Inc.*, 30 Cal.4th 167, 132 Cal.Rptr.2d 490, 65 P.3d 1255, 1258 (2003). The additional element constitutes a "material conflict" in this case because Safrin and Egert argue that the lack of a special relationship with Amusement provides a ground for dismissal. *See Intellivision v. Microsoft Corp.*, 2008 WL 3884382, at *5 (S.D.N.Y. Aug. 20, 2008) (material conflict between New York and Connecticut claims for negligent misrepresentation where Connecticut has no "special relationship" requirement). A negligent misrepresentation claim is a "conduct regulating" claim rather than a "loss allocating" claim. *See id.* (collecting cases). Where conduct regulating rules are in conflict, "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993). In addition, where as here, "'the parties are domiciled in different states, the locus of the tort will almost always be determinative in cases involving conduct regulating' rules." *Intellivision*, 2008 WL 3884382, at *4 (quoting *Krock v. Lipsay*, 97 F.3d 640, 646 (2d Cir.1996)); *see also Cooney*, 81 N.Y.2d at 73–74, 595 N.Y.S.2d 919, 612 N.E.2d 277.

Both parties agree that the negligent misrepresentation claim is a "conduct regulating" rule but argue for the application of the laws of different states. Amusement cites *Intellivision* for the assertion that a cause of action arises where the loss is sustained, and the economic impact is felt—that is, the plaintiff's residence. 2008 WL 3884382, at *5. Amusement therefore asks the Court to apply California law. Pl. Opp. Mem. at 7. Safrin and Egert cite case law stating that the interest analysis is "flexible," *see, e.g., Mayer Brown*, 612 F.Supp.2d at 284, and urge the Court to take note that "the location where the loss was suffered is not dispositive of the choice of law analysis," Def. Reply at 5 (citing *Cromer Fin. Ltd. v. Berger*, 137 F.Supp.2d 452, 492–93 (S.D.N.Y.2001)).

To address this dispute, we find it useful to first review the facts of this case to determine their connections to each jurisdiction. *See Schultz*, 65 N.Y.2d at 197, 491 N.Y.S.2d 90, 480 N.E.2d 679 ("[T]he law of the jurisdiction having the greatest interest in the litigation will be applied and . . . the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." (citations omitted; omissions and brackets in original)).

First, we look at the parties' domiciles and the locus of the tort. *Id.* Amusement and Practical (the assignee of Amusement's interests) are both California corporations and each maintains its principal place of business in that state. Compl. ¶¶ 6–7. Safrin and Egert are citizens of New York. *Id.* ¶¶ 9–10. Defendants Stern and Frenkel are citizens of New York and they are both principals of businesses at issue in this case that are organized under the laws of New York and maintain their principal places of business in New York. *Id.* ¶¶ 11–12, 14–15.[4] Friedman is an attorney licensed to practice in New York and who practiced at BIR, a New York law firm. *See* Complaint, filed Dec. 27, 2007 (Docket # 1) ("Original Complaint") ¶ 8. Steven Alevy is the principal of Bankers Capital, a New York limited liability company. *Id.* ¶ 30.

While Amusement correctly argues that it "felt" the economic loss of the alleged tort in California, Pl. Opp. Mem. at 7, New York was the site of the alleged fraud, negligent misrepresentations, and the resulting unauthorized use of Amusement's $13 million. First, all of the alleged misrepresentations were made in New York by Safrin and Egert, or their purported agent, Friedman. *See* Compl. ¶ 23 (Friedman enticed Amusement by stating that Safrin, "a respected New York real estate investor," was participating); *id.* ¶ 24 (Safrin expressed pleasure to Steven Alevy about participating with the Alevy family during a walk on West End Avenue);[5] *id.* ¶ 27 ("Egert directed Steven Alevy to negotiate with Friedman" for a larger equity stake coming from Safrin's share); *id.* ¶¶ 15, 32 (Amusement wired $13 million to LTA, a New York entity); *id.* ¶¶ 74(a)-(k) (false statements originating in New York made by Safrin, Stern, Egert, and Friedman to induce Amusement to wire $13 million into escrow). Furthermore, the original agreement in the LOU to transfer the $13 million, *id.* ¶ 31, into escrow was

---

4. Defendant First Republic Group Realty LLC is a Delaware limited liability company with its principal place of business in New York and Defendant First Republic Group, Corp. is a New York corporation with its principal place of business in New York. Compl. ¶¶ 11–12.

5. The statements to Steven Alevy are important because Amusement argues in its submissions that all statements made to Steven Alevy by Safrin, Egert, and Friedman were made with the intention of reaching Amusement and inducing its reliance. Pl. Opp. Mem. at 12–13 (arguing for the application of the doctrine of "indirect reliance").

executed by Stern, a New Yorker, on behalf of First Republic, a New York entity, *id.* ¶¶ 8, 11–12.

Finally, plaintiffs' injury arose when the money it thought was safely in escrow with LTA and Frenkel (both in New York) was moved to an account controlled by First Republic. *Id.* ¶¶ 32, 40. Neither of these accounts is alleged to have been in California.

■ Some courts apply the "last event necessary" test and choose the law of the place where the loss was suffered. *See, e.g., LaSala v. Bank of Cyprus Pub. Co.,* 510 F.Supp.2d 246, 264 (S.D.N.Y.2007); *Schultz,* 65 N.Y.2d at 195, 491 N.Y.S.2d 90, 480 N.E.2d 679 ("[W]hen the defendant's negligent conduct occurs in one jurisdiction and the plaintiff's injuries are suffered in another, the place of the wrong is considered to be the place where the last event necessary to make an actor liable occurred."). Under this doctrine, California law might apply because Amusement "felt its loss" in the state of its domicile. However, where as here, a single state was the overwhelming center of the events giving rise to the case, and that state has a strong interest in regulating the conduct performed within its borders, the last event necessary test will not be blindly applied. *See, e.g., Mayer Brown,* 612 F.Supp.2d at 283–84 (location of the loss does not override full interest analysis where there is another location with a greater interest in having its law applied); *Cromer,* 137 F.Supp.2d at 492 (disregarding last event necessary test and applying law of "jurisdiction where the fraud originated and where substantial activities in furtherance of the fraud were committed"). As the New York Court of Appeals has noted, the law attempts to protect the "reasonable expectations of the parties" who relied on the jurisdiction's law to govern their conduct and seeks to further "the admonitory effect that applying its law will

have on similar conduct in the future." *Schultz,* 65 N.Y.2d at 198, 491 N.Y.S.2d 90, 480 N.E.2d 679. Although the plaintiffs felt economic harm in California, New York was the site of virtually all the conduct at issue in the transaction. Thus, Amusement should have reasonably expected that New York law would govern any claims arising out of the financing of this transaction. *See id.* at 201–02, 491 N.Y.S.2d 90, 480 N.E.2d 679 (applying law of state where center of claims occurred, not law of state which had "only isolated and infrequent contacts," thus meeting parties' reasonable expectations). Applying California law would not deter similar future conduct arising out of New York-centered activities. *See United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F.Supp.2d 198, 215 (S.D.N.Y.2002) (choosing to apply law of Canada, where conduct constituting fraudulent conveyance of funds occurred, because of the "admonitory effect that applying its law will have on similar conduct in the future").

Thus, we apply New York law to Amusement's negligent misrepresentation claims.

### 3. *Agency*

■ In alleging an agency relationship between Friedman and Safrin and Egert, Amusement has cited to both New York and California law. But it has made no objection to the application of New York law and has not briefed the choice of law question as to agency. In these circumstances, we deem the parties to have implicitly consented to having New York law apply, and this "'implied consent ... is sufficient to establish choice of law'" on the question. *Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 138 (2d Cir.2000) (quoting *Tehran–Berkeley Civil & Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton,* 888 F.2d 239, 242 (2d Cir.1989) (omission in original)). In addition, there is no "actual conflict" of the agency princi-

ples asserted by Amusement—a fact demonstrated by Amusement's parallel citation of New York and California authority for the same points of law.

### 4. *Conspiracy*

Similarly, because the parties cite only New York law in their arguments regarding the conspiracy claims, they have implicitly consented to having New York law apply to these claims as well. *Krumme*, 238 F.3d at 138.

### 5. *Equitable Lien, Constructive Trust, and Purchase Money Resulting Trust*

Finally, there is a choice of law issue with respect to Amusement's claims for an equitable lien on the Portfolio, a constructive trust, and a purchase money resulting trust. Amusement seeks to have the law of the situs of the properties in the Portfolio apply—Alabama, Georgia, and Virginia, while Safrin and Egert cite primarily to New York law.[6]

■ Because New York and Alabama law impose a confidential relationship requirement before granting a constructive trust, while Georgia, Virginia, and North Carolina law do not,[7] there is a material conflict, and we therefore apply the law of the situs of the properties. *See SEC v. Credit Bancorp, Ltd.*, 138 F.Supp.2d 512, 531 (S.D.N.Y.2001) ("The 'general rule' under both state and federal choice of law rules is that 'the law of the situs of the property, and therefore the trust, governs [the] determination' of whether property in the possession of a debtor is held in constructive trust.") (citations omitted), *rev'd on other grounds*, 297 F.3d 127 (2d Cir. 2002).

On the other hand, there is no actual conflict between New York law and the law of each of the situs jurisdictions with respect to purchase money resulting trusts. Each of the situs jurisdictions requires a transfer of title to the wrongdoer when another person paid a part of the sum to purchase the property.[8] Because

6. While the Portfolio also includes properties in North Carolina, *see* Grant Deeds (July 12, 2007) (annexed as Ex. 1 to Complaint), neither party has argued that the law of North Carolina should apply to any of Amusement's claims.

7. *Compare In re Ades & Berg Group Investors*, 550 F.3d 240, 245 (2d Cir.2008) ("New York law requires four elements to prove a constructive trust: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." (quoting *Sharp v. Kosmalski*, 40 N.Y.2d 119, 121, 386 N.Y.S.2d 72, 351 N.E.2d 721 (1976))), *and Herston v. Austin*, 603 So.2d 976, 979 (Ala.1992) ("constructive trust . . . imposed upon property whenever the circumstances under which it was acquired make it inequitable that it should be retained by the holder of legal title provided some confidential relationship exists between the grantor and grantee; and provided . . . a trust is necessary to prevent a failure of justice" (citation and quotation marks omitted)), *with Lee v. Lee*, 260 Ga. 356, 357, 392 S.E.2d 870 (1990) ("construc-

tive trust may be imposed where property has been acquired by fraud, or where, though not acquired by fraud it is against equity that it should be retained by the person who holds it"); *Richardson v. Richardson*, 242 Va. 242, 245, 409 S.E.2d 148 (1991) ("Constructive trusts arise . . . . not only where property has been acquired by fraud or improper means, but also where it has been fairly and properly acquired, but it is contrary to the principles of equity that it should be retained, at least for the acquirer's own benefit.") (citations omitted), *and Wilson v. Crab Orchard Dev. Co.*, 276 N.C. 198, 211, 171 S.E.2d 873 (1970) ("A constructive trust is a duty, or relationship, imposed by courts of equity to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust.") (citations omitted).

8. *See, e.g., Mendel v. Hewitt*, 161 A.D.2d 849, 851, 555 N.Y.S.2d 899 (3d Dep't 1990) (citing

there is no material conflict, we apply New York law to Amusement's purchase money resulting trust claim.

It is possible that there is a material conflict between New York and the situs jurisdiction laws with respect to equitable liens because New York law requires the existence of a confidential relationship,[9] and we therefore apply the law of the situs—that is, Alabama, Georgia, Virginia, and North Carolina law.

## III. DISCUSSION

### A. Agency

Amusement alleges that Friedman had actual and/or apparent authority to bind Safrin and Egert, e.g., Compl., ¶ 27, and the assumption that Friedman was acting as agent for Safrin and Egert underpins many of Amusement's claims. Accordingly, we address initially and separately whether the complaint properly alleges

that Friedman was Safrin and Egert's agent.

Under New York law, "[a]gency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." In re Shulman Transp. Enters., Inc., 744 F.2d 293, 295 (2d Cir.1984) (citations and quotation marks omitted); accord Old Repub. Ins. Co. v. Hansa World Cargo Serv., Inc., 51 F.Supp.2d 457, 471 (S.D.N.Y.1999). An agency relationship is generally created by "written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." Nationwide Life Ins. Co. v. Hearst/ABC–Viacom Entm't Servs., 1996 WL 263008, at *7 (S.D.N.Y. May 17, 1996) (citation and internal quotation marks omitted); accord Old Repub. Ins.

N.Y.E.P.T.L. § 7–1.3(a)) (resulting trust established if "(1) title to property is taken in the name of one person without the consent or knowledge of the person who paid a consideration for the transfer, or (2) in violation of a trust, the transferee has purchased property with the money of another person"); Ga.Code Ann. § 53–12–92(a) (trust implied after transfer of legal title to another of real or personal property); Smith v. Smith, 6 So.3d 534, 540 (Ala.Civ.App.2008) (trust implied when one person pays and title taken in name of another); Leonard v. Counts, 221 Va. 582, 588, 272 S.E.2d 190 (1980) (trust arises when one person pays but title is conveyed to another); Mims v. Mims, 305 N.C. 41, 46, 286 S.E.2d 779 (1982) (trust "results from the fact that one man's money has been invested in land and the conveyance taken in the name of another.") (citation and internal quotation marks omitted).

9. For example, under New York law, an equitable lien can be imposed based on an express or implied agreement. Teichman v. Cmty. Hosp. of W. Suffolk, 87 N.Y.2d 514, 520, 640 N.Y.S.2d 472, 663 N.E.2d 628 (1996). New York law also requires the finding of a confi-

dential relationship between the parties before it will impose an equitable lien. See U.S. v. Lesak, 2009 WL 1788411, at *5 n. 5 (S.D.N.Y. June 23, 2009) ("With respect to real property, an equitable lien is created by implication when a party standing in a confidential relationship with the legal owner of the property makes payments from his or her own funds toward the purchase price ... which would entitle that party to restitution.") (citations and internal quotation marks omitted). However, under Virginia law, an equitable lien on real property will generally be imposed only when there is a written contract. See Wu v. Tseng, 459 F.Supp.2d 468, 474–75 (E.D.Va.2006) (citations omitted). There is no confidential relationship requirement under Alabama law, see Costanza v. Costanza, 346 So.2d 1133, 1136 (1977), under Georgia law, see Middlebrooks v. Lonas, 246 Ga. 720, 721, 272 S.E.2d 687 (1980), or under North Carolina law, see Embree Const. Group, Inc. v. Rafcor, Inc., 330 N.C. 487, 496, 411 S.E.2d 916 (1992); Falcone v. Juda, 71 N.C.App. 790, 793, 323 S.E.2d 60 (N.C.App. Ct.1984) (confidential relationship not required, but often justifies imposition of equitable lien).

*Co.*, 51 F.Supp.2d at 471. When an agency relationship is established, the principal will be liable to third parties for the acts of its agent that were within the scope of the agent's actual or apparent authority. *See Citibank, N.A. v. Nyland (CF8) Ltd.*, 878 F.2d 620, 623–24 (2d Cir.1989) (citation omitted); *Defer LP v. Raymond James Fin., Inc.*, 654 F.Supp.2d 204, 213 n. 69 (S.D.N.Y.2009).

 We begin by addressing the question of whether the pleadings are sufficient with respect to the question of actual authority. Actual authority is bestowed upon an agent "by direct manifestations from the principal to the agent, and the extent of the agent's actual authority is interpreted in the light of all circumstances attending these manifestations, including the customs of business, the subject matter, any formal agreement between the parties, and the facts of which both parties are aware." *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir.1997) (citation and internal quotation marks omitted); *accord AdiPar Ltd. v. PLD Int'l Corp.*, 2002 WL 31740622, at *9 (S.D.N.Y. Dec. 6, 2002) (same). An actual agency relationship "is formed . . . on the actual interaction between the putative principal and agent, not on any perception a third party may have of the relationship." *Dinaco, Inc. v. Time Warner Inc.*, 2002 WL 31387265, at *3 (S.D.N.Y. Oct. 22, 2002) (citing *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*, 909 F.2d 698, 702 (2d Cir.1990)), *aff'd*, 346 F.3d 64 (2d Cir. 2003). Actual authority need not be based on the express agreement between

the parties; it can be "given implicitly by a principal to his agent or as a kind of authority arising solely from the designation by the principal of a kind of agent who ordinarily possesses certain powers." *Marfia v. T.C. Ziraat Bankasi*, 100 F.3d 243, 251 (2d Cir.1996) (citation and internal quotation marks omitted). As applied to an attorney-client relationship, an attorney has actual authority to act as an agent where "a contract of employment, either express or implied, . . . exist[s] between the attorney and the party for whom he purports to act." *Bingham v. Zolt*, 683 F.Supp. 965, 976 (S.D.N.Y. 1988).[10]

Commonly, an outsider will not be privy to the details of what conversation or conduct took place between a principal and the agent. Thus, courts have recognized that to survive a motion to dismiss under 12(b)(6) on this issue, a plaintiff need only "raise[ ] a sufficient inference that some sort of agency relationship existed between" the purported principal and agent. *Commercial Fin. Servs., Inc. v. Great Am. Ins. Co. of N.Y.*, 381 F.Supp.2d 291, 302 (S.D.N.Y.2005); *cf. Cannon v. Douglas Elliman, LLC*, 2007 WL 4358456, at *5 (S.D.N.Y. Dec. 10, 2007) (dismissing agency claim under Fed.R.Civ.P. 12(b)(6) where defendant offered "no facts from which inferences of actual or apparent authority" could be drawn); *see generally Ashcroft*, 129 S.Ct. at 1949 (claim is facially plausible when "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged") (citation omitted).

10. Actual authority is different from apparent authority. Apparent authority is created by "words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction. . . . In such circumstances, the third party's reasonable reliance upon the appearance of authority binds the principal." *Standard Funding Corp. v. Lewitt*, 89 N.Y.2d 546, 551, 656 N.Y.S.2d 188, 678 N.E.2d 874 (1997) (citations and internal punctuation omitted). As noted below, we do not reach the question of whether the amended complaint pleads that Friedman had apparent authority.

To satisfy this burden on a motion to dismiss, circumstantial evidence is sufficient to establish the agent's authority to act for the principal. *See Lee v. Kim,* 1994 WL 586435, at \*3 (S.D.N.Y. Oct. 25, 1994) (citation omitted). Indeed, New York courts have stated broadly that "[w]here the circumstances alleged in the pleading 'raise the possibility of a principal-agent relationship', and no written authority for the agency is established, questions as to the existence and scope of the agency" are issues for the jury. *Maurillo v. Park Slope U–Haul,* 194 A.D.2d 142, 147, 606 N.Y.S.2d 243 (2d Dep't 1993) (quoting *Fogel v. Hertz Int'l, Ltd.,* 141 A.D.2d 375, 376, 529 N.Y.S.2d 484 (1st Dep't 1988); *Hedeman v. Fairbanks, Morse & Co.,* 286 N.Y. 240, 36 N.E.2d 129 (1941)); *accord Heredia v. United States,* 887 F.Supp. 77, 80 (S.D.N.Y.1995).

▇▇ In this case, Amusement has pled a number of facts that, taken together, easily allow a reasonable inference that Safrin and Egert at some point had given Friedman actual authority to act on their behalf with respect to the Portfolio transaction. These facts include the following: (1) Friedman approached Amusement stating that he represented not only Stern and First Republic but also Safrin and Egert, and that Safrin, a respected New York real estate investor, was supplying much of the equity needed for the acquisition, Compl. ¶ 23; (2) "Friedman repeatedly represented to Amusement that he had been retained by ... Safrin and Egert to act as an attorney for them and to serve as an agent for them," *id.* ¶ 25; (3) a retainer letter from Friedman to Egert existed indicating that Friedman was representing "The Safrin Group" on at least some real estate matters, *id.* ¶ 27; Retainer letter; (4) Friedman conveyed Safrin's personal financial statements and tax returns to "interested parties," Compl. ¶ 27; (5) Egert, who is Safrin's son-in-law, told Steven Alevy that Friedman had authority to bind Egert and Safrin with regard to negotiating the relative equity participations in the Portfolio, *id.* ¶¶ 27, 74(j); (6) Friedman sent an assignment of Safrin's membership interest in First Republic and the underlying LLC ownership structure to Amusement that contained Safrin's purported signature, *id.* ¶¶ 44, 45(b); Signed Assignment of Interest by Safrin, undated (annexed as Ex. 5 to Original Complaint); (7) during the two weeks preceding the transmittal of Amusement's $13 million, "Egert directed Steven Alevy to negotiate with Friedman for a larger part of the equity in the Portfolio that would come from Safrin's share," *id.* ¶ 27; and (8) Safrin told Steven Alevy that he was participating in the acquisition of the Portfolio, *id.* ¶ 74(b).

In other words, this is not a situation where an individual without any connection to a principal asserted that he was the principal's agent. Rather, there were numerous other circumstances strongly suggesting that Friedman was acting as an agent for Safrin and Egert, thus rendering it plausible that they had given him actual authority to act on their behalf.

Safrin and Egert counter these allegations by arguing (1) that Safrin has no interest in The Safrin Group, the entity named in the Retainer letter, and (2) that the language of the Retainer letter clearly demonstrates that there was no agency agreement for the Portfolio transaction. Def. Reply at 15–16. But Safrin and Egert miss the import of the facts alleged by Amusement. At this stage of the proceeding, the question is not whether this particular retainer agreement created actual authority. Indeed, we need not reach Amusement's argument, *see* Pl. Opp. Mem. at 8–11, that the Retainer letter granted actual authority to Friedman to act on the transaction. Rather, the significance of this letter and of the allegations in the

amended complaint is that they reflect that Friedman was not some unknown person making implausible claims that he had an agency relationship with Safrin and Egert. Rather, he had a history of having such a relationship and gave indicia that he continued to have such a relationship. That the Retainer letter could be alleged as excluding the particular agency relationship claimed here is thus not fatal to Amusement's assertion that there is circumstantial evidence suggesting that Friedman had actual authority. *See Commercial Fin. Servs., Inc.,* 381 F.Supp.2d at 302 (although plaintiff "acknowledge[d] that there ... [were] formal contract documents contrary to [its] assertion of actual and apparent authority ... this does not mean that discovery will not establish that" the purported principal "expressly or impliedly authorized" an action on its behalf) (internal citation omitted).

While, understandably, Amusement has not made allegations regarding what conversations regarding Friedman's authority took place between Safrin or Egert and Friedman, Amusement has alleged enough evidence from which it could be reasonably inferred that there was in fact a principal-agent relationship for the purposes of the acquisition of the Portfolio. To look at just one of the allegations, Friedman possessed and conveyed Safrin's own financial documents and Safrin's signed assignment of his membership interest in First Republic. This strongly supports the inference of agency because business people typically do not provide such records to individuals who do not have authority to act on their behalf for at least some purposes. *See id.* at 301–02 (inference of agency where employees of corporate agent had countersigned principal's documents and chairman had signed documents as "Authorized Representative"); *see also Cannon,* 2007 WL 4358456, at *5 (noting in dictum that, inter alia, representations by an agent to a third party, and the signa-

ture of the alleged agent on documents for the alleged principal, would support an inference as to the existence of actual authority (citing *AdiPar Ltd.,* 2002 WL 31740622, at *9–10; *Commercial Fin. Servs., Inc.,* 381 F.Supp.2d at 302)). Lastly, Safrin himself told Steven Alevy that he was participating in the acquisition of the Portfolio, Compl. ¶ 74(b), and it is a reasonable inference that he would have participated through an attorney or other agent such as Friedman. And, of course, Egert, who is Safrin's son-in-law, told Steven Alevy that Friedman could bind Egert and Safrin. *Id.* ¶¶ 27, 74(j).

The cases cited by Safrin and Egert are distinguishable. Safrin and Egert cite *Heine v. Colton, Hartnick, Yamin & Sheresky,* 786 F.Supp. 360, 373 (S.D.N.Y. 1992) for the proposition that a previous representation of a client does not imply a current representation. Def. Reply at 16. But *Heine* was simply citing to a principle of criminal law that a prior representation by an attorney does not mean that an attorney represents an individual on all subsequent matters. 786 F.Supp. at 373 (citing *People v. Ellis,* 91 Misc.2d 28, 34, 397 N.Y.S.2d 541 (Sup.Ct.1977)). *Heine* itself did not even purport to address any pleading requirements with respect to actual authority but instead found a lack of an attorney-client relationship where the client himself conceded that he had engaged other attorneys to represent him on the transaction. 786 F.Supp. at 373–74. And here, of course, the prior representation is just one of many facts suggesting that Safrin and Egert had given authority to Friedman to act.

Another case cited by Safrin and Egert, *see* Def. Reply at 13, *Maung Ng We v. Merrill Lynch & Co., Inc.,* 2000 WL 1159835 (S.D.N.Y. Aug. 15, 2000), is of little relevance. In *Maung Ng We,* the plaintiff attempted to hold a parent corporation liable for the acts of its subsidiary.

In finding that there was no agency relationship, *Maung Ng We* emphasized that for actual authority to exist, the agent must act "subject to the principal's direction and control," 2000 WL 1159835, at *4 (citation and quotation marks omitted), and that there were no allegations of such control, *id.* at *5. In addition, the court noted that there were no allegations that the acts of the subsidiary were "taken on behalf of and for the benefit of the principal—not the agent." *Id.* at *9–10. Here, the allegations plainly show that Friedman was not acting on his own account—for example, by suggesting that his own money was backing the transaction—but rather that he was acting exclusively on behalf of Safrin and Egert.

Finally, Safrin and Egert rely heavily on *Adams v. Labaton, Sucharow & Rudoff LLP* for the proposition that a dismissal is proper where the plaintiff failed to plead any facts to show that the principal created the appearance of authority in the agent sufficient to bind the principal. Def. Reply at 13 (citing *Adams,* 2009 WL 928143, at *4 (S.D.N.Y. Mar. 20, 2009)). *Adams,* however, dealt only with apparent authority, not actual authority. 2009 WL 928143, at *1. We need not reach the question of whether the allegations show apparent authority, however, as Amusement's allegations raise a reasonable inference of actual authority, and such authority is a sufficient predicate for Amusement's claims.

B. *Fraud*

■ Amusement asserts that Safrin and Egert, directly and through their agent, Friedman, along with the other de-

fendants "knowingly made false statements to Amusement with the motive to induce it to place the $13 million in escrow with Frenkel and LTA and, after the money was misappropriated, to cause Amusement to believe that its money was still in escrow." Compl. ¶ 72. To state a claim for common law fraud, a plaintiff must show:

(1) defendant made a representation as to a material fact; (2) such representation was false; (3) defendant intended to deceive plaintiff; (4) plaintiff believed and justifiably relied upon the statement and was induced by it to engage in a certain course of conduct; and (5) as a result of such reliance plaintiff sustained pecuniary loss.

*Ross,* 8 N.Y.3d at 488, 836 N.Y.S.2d 509, 868 N.E.2d 189 (citation and internal punctuation omitted). Additionally, as already discussed, Fed.R.Civ.P. 9(b) requires that fraud be pled with particularity.

### 1. *Actionable Statements*

■ Amusement gives a listing in its amended complaint of the various statements forming the basis of the fraud claim. Compl. ¶¶ 72, 74(a)-(*o*), 75.[11] Included in the listing are statements made by either Friedman, Safrin, or Egert, on the one hand, to Steven Alevy or Bankers Capital, on the other hand—rather than to Amusement directly. *See* Compl. ¶¶ 74(b), 74(c), 74(d), 74(g), 74(k). These allegations can be summarized as consisting of statements by Safrin or Egert to Steven Alevy or Bankers Capital that Safrin and Egert were participating in the Colonial transaction and that certain arrangements were permissible under the Citigroup financing.[12]

---

**11.** Some of these statements are the subject of allegations made earlier in the amended complaint, the citations to which are not referenced in the paragraphs directly relating to the fraud claim.

**12.** In light of the conclusion that the amended complaint sufficiently alleges actual authority, we do not consider the statement, Compl. ¶ 74(j), that Egert told Steven Alevy that Friedman was Egert and Safrin's agent. *See* Compl. at 18 n. 2.

■ Defendants contend that these statements should not be considered because they were not made to Amusement directly but rather to third parties. Def. Mem. at 24–25; Def. Reply at 20–21, 25. To support the use of these statements as bases for its fraud claim, Amusement relies on a theory of reliance known as "indirect reliance." *See* Pl. Opp. Mem. at 12–13. The indirect reliance doctrine states that "a claim for fraud may lie even when a plaintiff does not directly rely on a fraudulent representation made by the defendant, if (1) the plaintiff received the information from someone who had received it from the defendant, and (2) the defendant intended the misrepresentation to be conveyed to [the plaintiff]." *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 310 (2d Cir.1994).[13]

Defendants make a number of arguments seeking to avoid use of these statements. Def. Mem. at 24–25; Def. Reply at 20–21, 25–26. They note that Steven Alevy, to whom many of the statements were made, is not alleged to be Safrin's or Egert's agent. Def. Mem. at 25. But such an allegation is not necessary. As long as Stern intended that Steven Alevy communicate the statements to an investor, such as Amusement, to induce that entity to invest, the elements of indirect reliance are satisfied. Defendants also note that it is not alleged that Steven Alevy ever actually told Amusement about the substance of these statements. *Id.* But the amended complaint makes clear that Amusement was relying on these statements in agreeing to supply the $13 million investment. *See, e.g.*, Compl. ¶¶ 23–25, 27.

In sum, because Amusement's amended complaint contains allegations allowing the inference that the statements made to Steven Alevy were intended to be conveyed to Amusement, we consider such statements, along with statements that are alleged to have been made to Amusement directly.

These statements are as follows:

1) In late May or early June of 2007, during an in person conversation on West End Avenue in New York City, Safrin told Steven Alevy that he was participating in the acquisition of the Portfolio. *Id.* ¶ 74(b).

2) During telephone conversations that took place in May or June of 2007, Stern and Egert told Steven Alevy that he and Safrin were equity participants in the planned acquisition of the Portfolio. *Id.* ¶ 74(c).

3) On June 4, 2007, by both telephone and e-mail, Friedman told Steven Alevy that Egert was to be placed on the advisory board of the entity that was acquiring the Portfolio. *Id.* ¶ 74(d).

---

**13.** Defendants suggest that cases such as *City of N.Y. v. Smokes–Spirits.com, Inc.*, 541 F.3d 425 (2d Cir.2008), *cert. granted sub nom. Hemi Group, LLC v. City of N.Y.*, —— U.S. ——, 129 S.Ct. 2159, 173 L.Ed.2d 1155 (2009), are relevant to Amusement's claims. Def. Reply at 25–26. But *Smokes–Spirits.com* and the other cases dealt with a different doctrine: the doctrine of "third-party reliance." *Id.* at 454. Under this doctrine, a third party who did not rely on a fraudulent statement attempts to use the reliance of a party who did rely on the fraudulent statement. *See Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 148 F.3d 194, 196 (2d Cir.1998). Here, by contrast, Amusement asserts that it relied on the fraudulent statements itself. *General Motors Corp. v. Villa Marin Chevrolet, Inc.*, 2000 WL 271965 (E.D.N.Y. Mar. 7, 2000), cited by defendants, *see* Def. Reply at 25, did not even specifically discuss the doctrine of "third party reliance." Rather, that case held that it was unreasonable "for a party to claim that it was fraudulently induced to enter into a contract by a prior representation of another party where reliance was specifically disclaimed in the agreement." *Gen. Motors Corp.*, 2000 WL 271965, at *31 n. 34 (citing *Harsco Corp. v. Segui*, 91 F.3d 337, 345 (2d Cir.1996)).

4) On June 5, 2007, by e-mail and later confirmed by Friedman by telephone, Stern told Bankers [Capital] that Safrin was a co-sponsor of the Portfolio acquisition and will sign the "carve-outs" on the financing package. *Id.* ¶ 74(g).

5) In telephone conversations between June 20 and 29, 2007, Friedman told Bankers and Amusement that a 50/50 equity split between Amusement on the one hand and Stern, Safrin and Egert on the other was permitted under the financing obtained from Citigroup. *Id.* ¶ 74(k).

6) From June 29, 2007 to July 15, 2007, while the parties sought to negotiate a final agreement governing the terms of Amusement's participation in the Portfolio, Stern, Safrin, Egert, First Republic, Frenkel and LTA had superior information concerning the fact that Amusement's money was removed from the account into which Amusement had wired it, this fact was not readily available to Amusement and Stern, Safrin, Egert, First Republic, Frenkel and LTA knew that Amusement was acting on the basis of mistaken knowledge. Nevertheless, Stern, Safrin, Egert, First Republic, Frenkel and LTA concealed from Amusement the fact that Amusement's money was removed from the account into which Amusement had wired it. *Id.* ¶ 75.

7) Stern, Safrin, Egert, First Republic, Frenkel and LTA knowingly made false statements to Amusement with the motive to induce it to place the $13 million in escrow with Frenkel and LTA and, after the money was misappropriated, to cause Amusement to believe that its money was still in escrow. These false statements were made by these defendants so that they could obtain and use Amusement's money to acquire the Portfolio. *Id.* ¶ 72.

### 2. *Pleading with Particularity under Rule 9(b)*

We now consider whether these seven statements "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Lerner,* 459 F.3d at 290.

Statements 1, 2, and 3, Compl. ¶¶ 74(b)-(d), plainly satisfy the first three elements as to specificity, identity of the speaker, and time and location. In addition, the amended complaint alleges that these statements were actually false and were made to induce Amusement to place the $13 million in escrow. *Id.* ¶ 74.

Statement 4, *id.* ¶ 74(g), satisfies the first three elements as to Stern but does not satisfy them as to Friedman. Because Stern is not alleged to be the agent of Safrin or Egert, Statement 4 will not be considered further.

Statement 5, *id.* ¶ 74(k), regarding the 50/50 split permitted under the Citigroup financing documents, also meets the four elements. It specifies the statement made, the identity of the speaker, where and when the statements were made, and why this statement was fraudulent. The fraudulent intent can be inferred here from the earlier allegation that such an equity split was not permitted under the Citigroup financing scheme. *Id.* ¶ 42.

Statement 6, *id.* ¶ 75, is an allegation of a fraudulent omission. Where fraud is "premised on an omission, a plaintiff must specify the person responsible for the failure to speak, the context of the omission, and the manner in which the omission misled the plaintiff." *Solutia Inc. v. FMC Corp.,* 456 F.Supp.2d 429, 449–50 (S.D.N.Y.2006) (quoting *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.,* 85 F.Supp.2d 282, 293 (S.D.N.Y.2000) (quotation marks omitted)). Statement 6 meets the first two elements

of the pleading burden. But because, as is discussed in the next section, Amusement has not shown reliance with respect to this omission, we do not discuss the remaining elements here.

Statement 7, Compl. ¶ 72, does not specify with particularity any of the statements made by each of the defendants it names. It fails to specify the contents of each statement, who made each statement, and when or where each statement was made. *See Sofi Classic S.A. de C.V. v. Hurowitz,* 444 F.Supp.2d 231, 248–49 (S.D.N.Y.2006) ("Where fraud is alleged against multiple defendants, a plaintiff must plead with particularity by setting forth separately the acts complained of by each defendant." (citation and internal quotation marks omitted)). Rather, Statement 7 reads more as a conclusion or summary explaining Amusement's theory of the events giving rise to this suit. It adds no new allegations and will not be considered as containing any independent actionable statements.

### 3. *Reasonable Reliance*

Safrin and Egert challenge the viability of Amusement's fraud claims by contending that Amusement could not have reasonably relied on the statements attributed to them. Def. Mem. at 24–25; Def. Reply at 21–24. A fraud claim under New York law requires that a plaintiff demonstrate its reasonable reliance upon a false statement made by the defendant. *See Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994). "The reliance requirement means that it is insufficient for a fraud plaintiff to show

merely that some chain of events beginning with a false statement by defendants led to his injury." *Schuh v. Druckman & Sinel, LLP,* 2008 WL 542504, at *10 (S.D.N.Y. Feb. 29, 2008).

The issue of reasonable reliance as to Statements 1, 2, 3, and 5 is the same. These allegations all assert that Amusement relied on the participation of Safrin and Egert in deciding to take part in the deal, and thus, in placing the $13 million in escrow. Safrin and Egert argue that the subsequent entering into of the LOU bars any reliance on statements made before and not contained in the agreement. Def. Mem. at 22–24; Def. Reply at 21–24. However, the terms of the LOU and the identity of its signatories are not crucial to the issue of reliance. Amusement alleges that Safrin and Egert, through Friedman, represented that they would be significant equity participants in the transaction, *see* Compl. ¶¶ 2, 23, 24, 27, 74(c), 74(f); that Amusement relied on these representations to invest its money in the transaction, *see id.;* and that Safrin and Egert did not so participate, *see id.* ¶ 74. In other words, the LOU is not of great significance because it was merely the vehicle by which Amusement was induced to part with its $13 million, which ultimately was used by Safrin and Egert, among others. Nothing in the terms of the LOU should have caused Amusement to believe that Safrin and Egert were no longer participants in the transaction. Accordingly, Amusement has pled reasonable reliance as to Statements 1, 2, 3, and 5.[14]

---

**14.** Safrin's and Egert's argument that the subsequent entering into of the LOU barred any reliance on statements made before and not contained in the agreement, *see* Def. Mem. at 22–24; Def. Reply at 21–24, would fail in any event. This argument might have weight if the LOU contained a merger clause barring reliance on specific previous statements that were made. *See Superior Tech. Res., Inc. v. Lawson Software, Inc.,* 17 Misc.3d 1137(A),

2007 WL 4291575, at *10 (N.Y.Sup.Ct. Dec. 7, 2007) ("[T]o be effective in barring a fraud claim ... [t]he language of the merger clause must directly relate to the specific misrepresentations which form the basis of the fraud claim.") (citations omitted). Here, neither party has claimed that there was such a merger clause in the LOU.

Safrin and Egert also argue that the alleged representations that they were supplying equity for the transaction were unactionable promises of future conduct. Def. Mem. at 18. While they correctly point out that "a failure to perform promises of future acts is not fraud unless there exists an intent not to comply with the promise at the time it is made," *Murray v. Xerox Corp.*, 811 F.2d 118, 121 (2d Cir. 1987), the amended complaint indeed alleges that Safrin and Egert did not intend to comply with their promises. Specifically, the amended complaint alleges that the statements they made as to their participation in the deal were "knowingly" false and were made "with the motive to induce [Amusement] to place the $13 million in escrow." Compl. ¶ 72.

■■■ Showing that Amusement reasonably relied on Statement 6, *id.* ¶ 75, requires showing detrimental reasonable reliance on an omission. Nothing in the amended complaint explains how Amusement was harmed by the failure to reveal that the money was no longer in the escrow account. While Amusement was obviously harmed by the loss of its $13 million, the amended complaint does not allege that—at any point during the period when defendants failed to inform plaintiff that the money had been moved out of the escrow account—Amusement took any detrimental action in reliance on that particular omission.

### 4. Causation

Finally, Safrin and Egert argue that their alleged statements, or the statements made by Friedman on their behalf, did not cause Amusement's injuries. Def. Mem. at 13–18. "To establish causation, plaintiff must show both that defendant's misrepresentation induced plaintiff to engage in the transaction in question (transaction causation) and that the misrepresentations directly caused the loss about which plaintiff complains (loss causation)." *Laub v. Faessel*, 297 A.D.2d 28, 31, 745 N.Y.S.2d 534 (1st Dep't 2002) (citations omitted). We address each type of causation separately.

### a. Transaction Causation

■■■ Transaction causation is demonstrated when a defendant's misrepresentations induce a plaintiff to act, *Laub*, 297 A.D.2d at 31, 745 N.Y.S.2d 534, and the plaintiff would not have acted without the defendant's misrepresentation, *see Sterling Nat'l Bank v. Ernst & Young LLP*, 62 A.D.3d 584, 584, 881 N.Y.S.2d 39 (1st Dep't 2009). Safrin and Egert equate transaction causation with "but for" causation. Def. Reply at 7. Assuming without deciding that this is the proper test for a common-law fraud claim in New York, the test is easily met here as Amusement alleges that Safrin and Egert's statement regarding their participation induced it to make the $13 million investment. Safrin and Egert argue that they were not a "but for" cause of Amusement's injuries because Safrin and Egert did not cause Amusement to enter into the LOU specifically, *see id.* at 8, which Safrin and Egert apparently view as the act that triggered Amusement's investment of the $13 million. They note that they are not parties to the LOU, and thus conclude that Amusement's loss must be attributed to parties other than themselves because those parties improperly caused Amuse-

---

Safrin and Egert also argue that Amusement could not have reasonably relied on their equity participation because Safrin and Egert were not parties to the LOU. Def. Mem. at 23. But the terms of the LOU are consistent with Amusement's claim that the final agreement contemplated Safrin and Egert's participation in the transaction because the LOU stated only that *Amusement* would receive a 50% equity interest. *See* Compl. ¶ 31(a).

ment to lose the money in escrow. *Id.* at 8, 10.

But even if it were true that Amusement would not have been injured but for the improper release of the funds by other parties, this is of no moment, as an injury to a party may have arisen from multiple "but for" causes. *See Zito v. Leasecomm Corp.*, 2003 WL 22251352, at *19 (S.D.N.Y. Sept. 30, 2003); *accord Sterling Nat'l Bank v. Ernst & Young, LLP*, 9 Misc.3d 1129(A), 2005 WL 3076341, at *5 (N.Y.Sup. Ct.2005) ("[t]he fraudulent misrepresentations on the part of defendants need not be the sole inducing cause of the damage. It is sufficient if such representations be an inducing cause") (citations and internal quotation marks omitted) (bracket in original). Here, Amusement alleges that it was harmed not merely by the improper movement of its money out of the escrow account, but more generally, as a result of Safrin's and Egert's improper use of its $13 million investment. Compl. ¶¶ 4, 48.

In sum, because Amusement alleges that the representations by Safrin's and Egert's agent that they were participating in the transaction caused it to invest in the Portfolio transaction, *e.g.*, Compl. ¶¶ 2, 29, they have sufficiently alleged that "but for" these representations, Amusement would not have suffered the loss of its $13 million.

### b. *Proximate (Loss) Causation*

Both the First Department and the Second Circuit have equated loss causation in a common law fraud claim with the "proximate causation" requirement found in other tort cases and in the federal securities context. *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 196–97 (2d Cir.2003) (proximate causation in common law fraud claims comparable to loss causation in federal securities fraud claims); *Laub*, 297 A.D.2d at 31, 745 N.Y.S.2d 534 ("Loss causation is the fundamental core of the common-law con-

cept of proximate cause."); *accord AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 209 (2d Cir.2000) ("Loss causation is causation in the traditional 'proximate cause' sense—the allegedly unlawful conduct caused the economic harm.") (citation omitted).

■ To state a claim for loss causation, a plaintiff must show that the defendant's misrepresentation "directly and proximately caused his investment losses." *Laub*, 297 A.D.2d at 31, 745 N.Y.S.2d 534 (citations omitted). As is true for proximate causation, a plaintiff must show that its damages were "a foreseeable consequence of any misrepresentation or material omission." *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir.2001) (citation omitted).

Safrin and Egert make two arguments in an attempt to show that they did not proximately cause Amusement's injury. First, they contend that they had no way of knowing that their statements would lead to the unauthorized transfer of the $13 million into an account owned solely by First Republic. Def. Reply at 12. This assertion, however, is foreclosed by the amended complaint's allegations that Friedman was speaking on behalf of Safrin and Egert pursuant to his actual authority to do so. According to Amusement, Friedman's statements regarding Safrin's and Egert's participation induced Amusement to invest in the Portfolio. Compl. ¶¶ 2, 23.

Second, Safrin and Egert argue that they could not have caused Amusement's injury because (1) the improper actions of Frenkel and LTA as escrow agent cut off any liability for their representations about participating in the Portfolio, Def. Mem. at 15–16, (2) it was Stern who removed the money from the First Republic account, Def. Reply at 10–12, and (3) Steven Alevy's act of authorizing the release of the funds

cut off Safrin's and Egert's liability, Def. Mem. at 16.

None of these arguments are on point, however, because Amusement's injury cannot be narrowed to the removal of the funds placed in escrow. To the contrary, Amusement alleges that Egert and Safrin, along with the other defendants, improperly *used* the funds to complete the purchase of the Portfolio. *See, e.g.,* Compl. ¶¶ 48, 58, 72, 90. Safrin and Egert's argument is exemplified by their statement that "Safrin and Egert had no way of knowing that *any* negative consequence could flow from … the diversion of Plaintiffs' funds by their escrow agent." Def. Reply at 12. Whatever truth there may be to this statement, it cannot be considered on this motion to dismiss in which all of Amusement's allegations are assumed to be true. Those allegations are that Safrin and Egert among others "used Amusement's money to close the purchase of the Portfolio, even though they knew Amusement had not authorized the release of the funds." Compl. ¶ 48. In other words, the actions of other parties in releasing the funds from escrow did not cut off Safrin's and Egert's liability because Amusement alleges that Safrin and Egert, along with other defendants, used these funds *after* the release from escrow to purchase the Portfolio. *See generally Zito,* 2003 WL 22251352, at *20 ("To the extent that [defendant] argues that any losses were caused by its strategic partners, and not by it, that argument … is simply a denial of the facts alleged by the plaintiffs…. Plaintiffs may not be able to prove [their causation claim], but they have alleged it and are entitled to present evidence in support of their theory.").

The case law cited by the defendants, *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489 (2d Cir.1992); *Laub,* 297 A.D.2d 28, 745 N.Y.S.2d 534, supports the conclusion that Amusement has alleged this element

of its claim. In *Citibank,* Citibank sued sellers of aerospace subsidiaries alleging that they committed fraud by misrepresenting the true terms of the financing arrangement with the buyer. 968 F.2d at 1490–91. When the buyer defaulted on the loan, Citibank was unable to recover the full value of its investment from the sale of the collateral. *Id.* at 1492. The court found that Citibank failed to allege that the damages it suffered were proximately caused by the misrepresentation of the sellers about the financing arrangement because there was no connection between the sellers' misrepresentation and the subsequent decline in value of the collateral. *Id.* at 1496–97. Here, however, Amusement's claim is not that Safrin and Egert induced it to enter into a deal that subsequently went bad. Instead, Amusement alleges that Safrin and Egert induced it to hand over money that Safrin and Egert themselves (among others) used for their own benefit. Thus, unlike the situation in *Citibank,* here "the fraud and injury [are] connected; it … appear[s] in an appreciable sense that damage flowed from fraud as proximate and not remote cause." *Id.* at 1496 (citation omitted). The *Laub* case, also cited by defendants, is distinguishable for the same reason.

Accordingly, Amusement has adequately pled that Safrin and Egert caused their loss.

\* \* \*

In sum, the motion to dismiss Amusement's fraud claim is denied with respect to the statements contained in Compl. ¶¶ 74(b), 74(c), 74(d), 74(k). It should be granted as to the statements contained in *id.* ¶¶ 72, 74(g), 75.

### C. *Negligent Misrepresentation*

A negligent misrepresentation claim under New York law requires a "special relationship of trust of confidence,

which creates a duty for one party to impart correct information to another, the information given was false, and there was reasonable reliance upon the information given." *See Plaza Penthouse LLP v. CPS 1 Realty LP*, 24 Misc.3d 1238(A), 2009 WL 2568734, at *4 (N.Y.Sup.Ct. Aug. 10, 2009) (citation and internal quotation marks omitted). Here, there was no special relationship between Safrin and Egert, on the one hand, and Amusement on the other. There is no allegation that the transaction between the defendants and Amusement was anything other than an arm's length business arrangement between sophisticated and experienced parties. *See id.* ("The present case involves an ordinary business relationship between a buyer and seller who negotiated a contract at arm's length, both being represented by counsel."); *accord Meisel v. Grunberg*, 651 F.Supp.2d 98, 123 (S.D.N.Y.2009) ("New York courts do not recognize a cause of action for negligent misrepresentation in the absence of some special relationship of trust or confidence between the parties." (citations and internal quotation marks omitted)); *Mayer Brown*, 612 F.Supp.2d at 285 (negligent misrepresentation claim dismissed because "plaintiffs failed to allege, as they must under New York law, that there was a 'near-privity' relationship between the parties"). Therefore, the negligent misrepresentation claim should be dismissed.

### D. *Conversion*

■ To state a claim for conversion under New York law, a plaintiff must show that "someone, intentionally and without authority, assume[d] or exercise[d] control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49–50, 827 N.Y.S.2d 96, 860 N.E.2d 713 (2006). A plaintiff must show (1) a "possessory right or interest in the property and (2)

defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Id.* at 50, 827 N.Y.S.2d 96, 860 N.E.2d 713 (citations omitted). Interference with a plaintiff's right to possession may be "by a wrongful: (i) taking; (ii) detention; or (iii) disposal." *Corporacion Fruticola De Chincha v. Watermelon Depot, Inc.*, 2008 WL 2986276, at *4 (S.D.N.Y. July 31, 2008) (citing *Pierpoint v. Hoyt*, 260 N.Y. 26, 29, 182 N.E. 235 (1932)). "Some affirmative act—asportation by the defendant or another person, denial of access to the rightful owner or assertion to the owner of a claim on the goods, sale or other commercial exploitation of the goods by the defendant—has always been an element of conversion." *State v. Seventh Regiment Fund, Inc.*, 98 N.Y.2d 249, 260, 746 N.Y.S.2d 637, 774 N.E.2d 702 (2002).

■ Amusement's allegations meet all these elements. Amusement alleges it placed its money into escrow with LTA pursuant to the LOU on June 29, 2007. Compl. ¶ 32. Amusement did not give authority for the money to be released. *Id.* ¶¶ 36–38. Despite the lack of authority to use the money, Safrin and Egert then used the escrow money for the closing of the Portfolio. *Id.* ¶ 48.

Safrin and Egert argue that the conversion claim fails because it must meet the heightened pleading requirement contained in Fed.R.Civ.P. 9(b) on the ground that the conversion claim is "premised on an allegation of a fraudulent taking." Def. Mem. at 34; *see also* Def. Reply at 32–33. But the cases they cite for this proposition hold only that claims premised on fraud must meet the Rule 9(b) requirements. *See, e.g., Spira v. Curtin*, 2001 WL 611386, at *4 (S.D.N.Y. June 5, 2001) (Rule 9(b) applies to claims "predicated on plaintiffs' allegations of fraud."); *Daly v. Castro Llanes*, 30 F.Supp.2d 407, 414 (S.D.N.Y.

1998) (Rule 9(b) applies were claim is "premised on fraud"); *Matsumura v. Benihana Nat'l Corp.,* 542 F.Supp.2d 245, 251 (S.D.N.Y.2008) ("heightened pleading requirements are applicable to any claim that 'sounds in fraud,' regardless of whether fraud is an element of the claim" (citing *Rombach v. Chang,* 355 F.3d 164, 166, 170 (2d Cir.2004))). Here, Amusement has stated a claim for conversion that does not require proof of fraudulent statements by Safrin and Egert or any intent to defraud. Because the claim for conversion exists independently of the claim for fraud, the heightened pleading standard of Rule 9(b) does not apply. *See, e.g., Zucker v. Katz,* 708 F.Supp. 525, 530 (S.D.N.Y.1989) ("Rule 9(b) is not applicable to ... conversion ... claims; it only applies to the claims sounding in fraud." (citation and internal quotation marks omitted)).

### E. *Conspiracy to Commit Conversion and/or Fraud*

■ Amusement alleges that Safrin and Egert participated in a conspiracy to commit conversion and/or fraud with respect to the misappropriation of the $13 million. To establish a prima facie case for conspiracy, a plaintiff must allege the primary tort and four additional elements: "(a) a corrupt agreement between two or more persons, (b) an overt act in furtherance of the corrupt agreement, (c) the parties' intentional participation in the furtherance of a plan or purpose, and (d) the

resulting damage or injury." *Chrysler Capital Corp. v. Century Power Corp.,* 778 F.Supp. 1260, 1267 (S.D.N.Y.1991) (citing *Kashi v. Gratsos,* 790 F.2d 1050, 1055 (2d Cir.1986)).[15]

■ We have already found that the primary torts—conversion and fraud—have been stated. With respect to the conspiracy elements, "great leeway should be allowed the pleader, since by the nature of the conspiracy, the details may not be readily known at the time of pleading." *Maersk, Inc. v. Neewra, Inc.,* 554 F.Supp.2d 424, 458 (S.D.N.Y.2008); *accord In re Harvard Knitwear, Inc.,* 153 B.R. 617, 628 (E.D.N.Y.1993) ("[T]he nature of conspiracies often make it impossible to provide details at the pleading stage. A plaintiff therefore should be allowed to resort to the discovery process and not easily be subject to dismissal of his complaint alleging conspiracy.").

Defendants point to the amended complaint's allegation that there was a conspiracy, *see* Def. Mem. at 36–37 (citing Compl. ¶ 93), and assert that it is conclusory. But there are numerous other allegations that provide evidence of the civil conspiracy elements, as has already been discussed. In multiple allegations, it is asserted that Safrin and Egert acted through Friedman to induce Amusement to transmit its funds to the escrow account. These facts easily provide circumstantial evidence to conclude that Safrin and Egert did not coinci-

---

**15.** The Court rejects defendants' argument that the elements of the civil conspiracy must comply with the particularity requirements of Fed. R. Civ. P. 9(b). As one case recently noted, "a claim for civil conspiracy is measured against the liberal pleading requirements of Federal Rule of Civil Procedure 8(a), and not the more rigorous requirements of Rule 9(b)." *Medtech Prods. Inc. v. Ranir, LLC,* 596 F.Supp.2d 778, 794 (S.D.N.Y.2008). The cases cited by defendants are not to the contrary. *JP Morgan Chase Bank v. Winnick,* 406 F.Supp.2d 247 (S.D.N.Y.2005), refused to reach the question, *see id.* at 252 n. 3. While *Spira* stated broadly that a number of claims, consisting of "breach of fiduciary duty, conversion and conspiracy" would be subject to the pleading requirements of Rule 9(b), it did so only because they "rest[ed] on allegations of fraud." 2001 WL 611386, at *3. *Spira* did not in fact analyze the four civil conspiracy elements according to the heightened pleading standard. Instead, it dismissed the claims at issue because the fraud claims had not been properly pled. *Id.* at *3–4.

dentally produce this result but instead had an agreement to act together. Similarly, the amended complaint alleges numerous overt acts in furtherance of this agreement; it alleges facts suggesting that Safrin and Egert participated in the financing arrangements through intentional acts; and it alleges that Amusement was damaged. Accordingly, the amended complaint plausibly alleges that the elements of civil conspiracy with respect to the fraud and conversion claims have been met.

### F. *Unjust Enrichment*

Under New York law, a plaintiff has stated a claim for unjust enrichment when it alleges "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir. 2000) (citation and internal quotation marks omitted); *accord Paramount Film Distrib. Corp. v. State of N.Y.,* 30 N.Y.2d 415, 421, 334 N.Y.S.2d 388, 285 N.E.2d 695 (1972) ("The essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered."), *cert. denied,* 414 U.S. 829, 94 S.Ct. 57, 38 L.Ed.2d 64 (1973). The essential fact necessary to prove such a claim is that "one party has received money or a benefit at the expense of another." *Kaye,* 202 F.3d at 616 (citation and internal quotation marks omitted). Therefore, to support a claim for unjust enrichment, Amusement must show that Safrin and Egert have received some benefit to its detriment. Amusement has stated a claim for unjust enrichment because it has alleged Safrin and Egert (among others) received a direct benefit from the transfer of the $13 million inasmuch as it allowed the real estate deal in which they were allegedly participating to

be completed. Compl. ¶¶ 48, 58. Obviously, Amusement has alleged that it was harmed by the loss of this money.

### G. *Claims for a Constructive Trust, Purchase Money Resulting Trust, and Equitable Lien*

#### 1. *Constructive Trust*

Under Alabama law, a "constructive trust may be imposed when property has either been acquired by fraud, or where, in the absence of fraud, it would be inequitable to allow the property to be retained by the person who so holds it," in other words, "to prevent unjust enrichment." *Hanner v. Metro Bank & Protective Life Ins. Co.,* 952 So.2d 1056, 1070 (Ala.2006) (citation omitted). However, Alabama law requires that there be a confidential relationship between the parties before a constructive trust will be imposed. *See, e.g., Herston,* 603 So.2d at 979 ("constructive trust ... imposed upon property whenever the circumstances under which it was acquired make it inequitable that it should be retained by the holder of legal title provided *some confidential relationship exists* between the grantor and grantee") (citation omitted) (emphasis added); *Talley v. Talley,* 248 Ala. 84, 87, 26 So.2d 586 (1946) ("constructive trust arises when one person, *occupying a fiduciary position,* or having placed himself in such position in relation to another that good faith requires him to act for the other and not himself, acquires title to the property in himself, in place of cestui que trust") (citations omitted) (emphasis added). Here, as previously discussed, the relationship between Amusement and Safrin/Egert was no different from that of two parties to any ordinary business arrangement. Because there was no confidential relationship, Amusement has failed to state a claim for a constructive trust under Alabama law.

■ A constructive trust under Georgia law is "implied whenever the circumstances are such that the person holding legal title to property, either from fraud or otherwise, cannot enjoy the beneficial interest in the property without violating some established principle of equity." O.C.G.A. § 53–12–93(a). The remedy is not an independent cause of action but a device by which property may be recovered if the person holding the property was unjustly enriched. *See St. Paul Mercury Ins. Co. v. Meeks*, 270 Ga. 136, 137, 508 S.E.2d 646 (1998). In other words, the trust is simply a remedy for recovery should a plaintiff's claim for unjust enrichment prevail. *see id.* Because we have already held that Amusement has stated a claim for unjust enrichment against Safrin and Egert, it will be entitled to a remedy of a constructive trust under Georgia law if it is ultimately able to prove its claim for unjust enrichment. Although Safrin and Egert argue that they did not obtain title to the Portfolio, Def. Mem. at 39, 41; Def. Reply at 38, 40–41, this is not explicitly required by the statute. Thus, Amusement has stated a claim for a constructive trust under Georgia law.

■ Under Virginia law, a constructive trust arises "independently of the intention of the parties, by construction of law; being fastened upon the conscience of him who has the legal estate, in order to prevent what otherwise would be fraud." *Leonard*, 221 Va. at 589, 272 S.E.2d 190 (citation and internal quotation marks omitted). "A constructive trust arises not only when there has been actual fraud, but whenever one holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it." *Id.* at 590, 272 S.E.2d 190 (citation and internal quotation marks omitted). Because Virginia law will impose a constructive trust when it is required to avoid unjust enrichment, *id.*;

*Richardson*, 242 Va. at 246, 409 S.E.2d 148, and because Amusement has alleged that Safrin and Egert have been unjustly enriched by the use of the $13 million, Amusement has stated a claim for a constructive trust under Virginia law.

■ Under North Carolina law, a constructive trust is imposed "to prevent the unjust enrichment of the holder of the legal title to property acquired through a breach of duty, fraud, or other circumstances which make it inequitable for him to retain it against the claim of the beneficiary of the constructive trust." *Sara Lee Corp. v. Carter*, 351 N.C. 27, 35, 519 S.E.2d 308 (1999) (citation and internal quotation marks omitted); *accord Tiber Holding Corp. v. DiLoreto*, 170 N.C.App. 662, 666, 613 S.E.2d 346 (N.C.App.Ct.2005). Such circumstances can include the prevention of unjust enrichment. *See Wilson*, 276 N.C. at 211, 171 S.E.2d 873. Although there is no confidential relationship, nor a breach of fiduciary duty between the parties, Amusement has sufficiently alleged that Safrin and Egert were unjustly enriched by the benefit of Amusement's $13 million to close the Portfolio purchase. Thus, Amusement has stated a claim for a constructive trust under North Carolina law.

### 2. *Purchase Money Resulting Trust*

■ A purchase money resulting trust requires either that "title to property" be taken in the name of the defendant or that the defendant actually "purchase[ ] property with the money of another person." *Mendel*, 161 A.D.2d at 851, 555 N.Y.S.2d 899 (citing N.Y.E.P.T.L. § 7–1.3(a)). On a number of occasions in its amended complaint, Amusement alleged that Safrin and Egert "purchased" the Portfolio, Compl. ¶¶ 44, 48, 58—and of course Amusement asserts that the purchase was effectuated in part with its money. Accordingly, the

amended complaint states a claim for a purchase money resulting trust.

### 3. Equitable Lien

Amusement alleges that it placed its $13 million into escrow pursuant to a contract with Stern, Safrin, Egert, and First Republic, which identified the Portfolio as security, and that both defendants and Amusement agreed in writing that the Portfolio would be security for Amusement's $13 million. Compl. ¶ 57.

█ Under Alabama law, a court may "exercise its equity power to impress a lien upon real property as security for a debt only where the person against whose interest the lien is declared and enforced is guilty of some wrongdoing in procuring the loan or service by which the debt is created." Costanza, 346 So.2d at 1136. Such wrongdoing can be in the form of "fraud," "unclean hands," or "unjust enrichment," so long as the culpable party has not merely engaged in passive conduct. Id.; accord Jordan v. Mitchell, 705 So.2d 453, 458 (Ala.Civ.App.1997) (recipient unjustly enriched when it "engage[s] in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship").

█ Here, Amusement has alleged that the LOU contemplated a security interest in the Portfolio, which is supported by Safrin's alleged attempted assignment of his interests in the entity that was to own the Portfolio. Although Amusement claims to have never accepted this assignment, it has alleged that the $13 million was used, despite the fact that no final agreement was reached, and that Safrin and Egert engaged in fraud to induce this arrangement, and were unjustly enriched by the benefit of the $13 million. Thus, Amusement has stated a claim for an equitable lien under Alabama law.

█ Similarly, under Georgia law, if a "defendant promised to repay a loan and did so without a present intent to perform, the plaintiff can enforce ... an equitable lien on the fund." Middlebrooks, 246 Ga. at 721, 272 S.E.2d 687 (citation and internal quotation marks omitted). Moreover, "if a plaintiff proves that the fraudulently procured funds were used by the defendant to purchase other property, the plaintiff can reach the other property 'by a proceeding in equity, and ... can enforce ... an equitable lien.'" Id. (quoting Pittman v. Pittman, 196 Ga. 397, 409, 26 S.E.2d 764 (1943)). Because Amusement alleges that the $13 million was used to purchase the Portfolio, Amusement has stated a claim for an equitable lien on the Portfolio under Georgia law.

█ Under Virginia law, "an equitable lien [on real property] must be in writing." See Wu, 459 F.Supp.2d at 474. More specifically, an equitable lien requires an "express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described and identified, security for a debt or other obligation." Id. (quoting Harnsberger v. Wright, 185 Va. 586, 589, 39 S.E.2d 737 (1946)). In the instant case, there is no written agreement between Amusement and Safrin and Egert evincing an intent to create a lien. Thus, Amusement has failed to state a claim for an equitable lien under Virginia law.

█ Under North Carolina law, an equitable lien is "a charge upon the property, which charge subjects the property to the payment of the debt of the creditor in whose favor the charge exists." Falcone, 71 N.C.App. at 793, 323 S.E.2d 60 (quoting Fulp v. Fulp, 264 N.C. 20, 24, 140 S.E.2d 708 (1965)) (internal quotation marks omitted). Such a lien may be created expressly by contract or by implication, and results when there are factors invoking equity, including but not limited

to a confidential relationship. *See Fulp,* 264 N.C. at 25, 140 S.E.2d 708. Other equitable factors that justify the imposition of an equitable lien under North Carolina law include unjust enrichment. *See, e.g., Richardson v. Carolina Bank,* 59 N.C.App. 494, 496, 297 S.E.2d 197 (N.C.App.Ct.1982); *Parslow v. Parslow,* 47 N.C.App. 84, 88–89, 266 S.E.2d 746 (N.C.App.Ct.1980). Because Amusement has made out a claim for unjust enrichment, it has also stated an entitlement to an equitable lien under North Carolina law.

### H. *Declaratory Judgment*

The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Amusement seeks a declaration that it has "a security interest in the eleven properties in the Portfolio in the amount of at least $13 million." Compl. ¶ 69.

 Declaratory judgment actions will be dismissed where they are duplicative of other relief sought in a complaint because they "will, of necessity, be resolved in the course of the litigation of the other causes of action." *Sofi Classic S.A. de C.V.,* 444 F.Supp.2d at 249–50 (citing *Del Greco v. CVS Corp.,* 337 F.Supp.2d 475, 488 (S.D.N.Y.2004)). Here, the issue of whether Amusement is entitled to a security interest in the Portfolio will be decided in the course of the litigation with respect to its claims for an equitable lien, constructive trust, and purchase money resulting trust. Therefore, this branch of the defendants' motion to dismiss should be granted.

## IV. *CONCLUSION*

For the foregoing reasons, Safrin's and Egert's motion to dismiss the amended complaint as against them (Docket # 266) should be granted in part and denied in part. Specifically, the following claims should be dismissed: (1) fraud as to the statements described in ¶¶ 72, 74(g), 75 of the amended complaint, (2) negligent misrepresentation, (3) the claim for a constructive trust under Alabama law, (4) the claim for an equitable lien under Virginia law, and (5) the claim for a declaratory judgment. The remaining claims should not be dismissed.

## *PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Lewis A. Kaplan, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Kaplan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).